UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

NATALIA CEBOLLERO-BERTRÁN,      )
                               )
        Plaintiff,             )
                               )
           v.                  )        No. 3:19-cv-01412-JAW
                               )
PUERTO RICO AQUEDUCT AND SEWER )
AUTHORITY,                     )
                               )
        Defendant.             )
_____)

NOEL I. REYES-MUÑOZ, et al.,    )
                               )
        Plaintiffs,            )
                               )
           v.                  )        No. 3:19-cv-02131-JAW
                               )
PUERTO RICO AQUEDUCT AND SEWER )
AUTHORITY,                     )
                               )
        Defendant.             )
_____)

**ORDER ON MOTION IN LIMINE AND MOTION FOR SUMMARY
JUDGMENT IN *REYES-MUÑOZ V. PRASA***

In a suit against the public water authority of the commonwealth of Puerto

Rico for violations of the federal Clean Water Act and related state law claims, the

defendant moves in limine for the court to dismiss the federal claim for lack of

standing, and further moves for summary judgment on the ground that 33 U.S.C. §

1365(b)(1) bars the federal cause of action on account of diligent prosecution. Based

on the record before it, the court concludes the plaintiffs have established standing to

bring their federal claim based on alleged property value diminution and accordingly

dismisses the defendant's motion in limine. Further, the court dismisses the

defendant's motion for summary judgment, concluding the defendant has failed to demonstrate its entitlement to judgment as a matter of law.

## I.    BACKGROUND[1]

### A.    Procedural History

On December 13, 2019, Noel Reyes-Muñoz and Olga Ramos-Carrasquillo (together, the Plaintiffs) filed a complaint against Puerto Rico Aqueduct and Sewer Authority (PRASA) and the federal Environmental Protection Agency (EPA), alleging a violation of the Clean Water Act (CWA) pursuant to 33 U.S.C. § 1365(a)(1), and related claims of state law nuisance, negligence, and riparian rights.[2]  *Compl.* (ECF No. 1).

PRASA moved to dismiss the complaint for lack of jurisdiction and failure to state a claim on February 7, 2020.  *Def. PRASA's Mot. to Dismiss* (ECF No. 11).  On March 13, 2020, Plaintiffs opposed the motion.  *Pls.' Consolidated Opp'n to Mot. to Dismiss* (ECF No. 17).  PRASA did not reply.  Then, on March 23, 2020, EPA filed a separate motion to dismiss for lack of subject matter jurisdiction.  *Mot. to Dismiss for Lack of Subject Matter Jurisdiction by Def. EPA* (ECF No. 18).  Plaintiffs responded to EPA's motion on May 8, 2020, again objecting to dismissal, *Pls.' Consolidated Opp'n to EPA's Mot. to Dismiss* (ECF No. 23), and EPA replied on June 1, 2020.  *Reply*

---

[1]    Unless otherwise noted, all docket entries cited in this subsection are from Case No. 3:19-cv-02131-JAW.

[2]    Here, the Plaintiffs include negligence and riparian rights in the heading of their complaint; however, they do not allege particular facts relating to these causes of action, nor do they specifically address these counts in the "Other Causes of Action" section of their complaint.  *See Compl.* at 1, 6 (ECF No. 1).  Although it is not included in the heading of the complaint, nuisance is the only state law claim the Plaintiffs discuss under "Other Causes of Action."  *Id.*

*in Support of Mot. to Dismiss for Lack of Subject Matter Jurisdiction* (ECF No. 27). On August 19, 2021, United States District Judge Silvia L. Carreño-Coll dismissed PRASA's motion to dismiss but granted EPA's motion to dismiss the claims against it on the basis of sovereign immunity. *Omnibus Op. and Order* at 2, 29 (ECF No. 35).

PRASA answered the complaint on November 30, 2021. *Answer to Compl.* (ECF No. 42). As discovery proceeded, the case was referred to United States Magistrate Judge López-Soler on March 6, 2023 for the Initial Scheduling Conference. *Order* (ECF No. 69).

### B.    Pending Motions

On May 31, 2024, PRASA filed a motion for summary judgment, asking Magistrate Judge López-Soler to dismiss the complaint in its entirety. *Mot. and Mem. in Support of Summ. J.* (ECF No. 151) (*PRASA's Summ. J. Mot.*). Plaintiffs opposed the motion for summary judgment on June 19, 2024. *Pls.' Consolidated Opp'n to Mot. for Summ. J.* (ECF No. 158) (*Pls.' Summ. J. Opp'n*). After seeking and being granted leave to file a reply, *Req. for Leave to File a Reply to Pls.' Opp'n to Summ. J.* (ECF No. 163); *Order* (ECF No. 164), PRASA replied in support of its motion on July 10, 2024. *Reply to Pls.' Opp'n to PRASA's Mot. for Summ. J.* (ECF No. 166) (*PRASA's Summ. J. Reply*). In response, Plaintiffs requested and were granted leave to file a sur-reply, *Mot. Seeking Leave to File Sur[-]Reply* (ECF No. 171); *Order* (ECF No. 172), which they filed on July 22, 2024. *Pls.' Sur[-]Reply to PRASA's Reply to Pls.' Consolidated Opp'n to Mot. for Summ. J.* (ECF No. 179) (*Pls.' Summ. J. Sur-reply*).

With PRASA's motion for summary judgment still pending, the parties engaged in pretrial preparation and settlement discussions. On July 18, 2024, the

parties jointly submitted a proposed pretrial order providing factual statements about each party's claim or defense, material and contested facts, stipulations regarding documentary evidence, and lists of witnesses. *Joint Proposed Pretrial Order* (ECF No. 175). Then, on August 9, 2024, PRASA filed a motion in limine to exclude certain evidence and asking the Court to dismiss Plaintiffs' case for lack of standing. *Mot. in Lim. to Exclude Evid. and Args. Relating to Pls.' Lack of Standing* (ECF No. 185) (*PRASA's Mot. in Lim.*). Plaintiffs responded in opposition on August 21, 2024. *Pls.' Reply in Opp'n to PRASA's Mot. in Lim. to Exclude Evid. and Args. Relating to Pls.' Lack of Standing, Pls.' Mot. in Lim. to Exclude PRASA's Evid.* (ECF No. 199) (*Pls.' Mot. in Lim. Opp'n*).

## C.    Status Order and Consolidation with *Cebollero-Bertrán v. PRASA*

On August 9, 2024, Magistrate Judge López-Soler entered an order of recusal in both the Plaintiffs' case and another citizen suit pending against PRASA, *Cebollero-Bertrán v. PRASA*, No. 3:19-cv-01412-JAW. *Order of Recusal*, No. 3:19-cv-01412-JAW (ECF No. 160); No. 3:19-cv-02131-JAW (ECF No. 184). Accordingly, by order of District of Puerto Rico Chief Judge Raúl Arias-Marxuach, the two cases were randomly reassigned to this Judge that same day. *Mem. of the Clerk*, No. 3:19-cv-01412-JAW (ECF No. 162); No. 3:19-cv-02131-JAW (ECF No. 188).

After cancelling the jury trial that had been scheduled to commence on August 26, 2024, *PRASA's Mot. in Lim.* at 1, the Court held a videoconference on September 3, 2024 with the counsel of both cases to discuss their status and the potential for

consolidation.[3]  *Min. Entry*, No. 3:19-cv-01412-JAW (ECF No. 178); No. 3:19-cv-02131-JAW (ECF No. 205).  First, the Court noted that there are motions for summary judgment pending in both cases and confirmed with counsel that the cases will not be ready for trial until the resolution of those dispositive motions.  *Status Order* at 1, No. 3:19-cv-01412-JAW (ECF No. 179); No. 3:19-cv-02131-JAW (ECF No. 206).  Second, the Court observed that PRASA's motion in limine seeking to dismiss the Plaintiffs' case for lack of standing and to prevent the admission of certain evidence remained pending and, after discussing with counsel, deemed it prudent to issue an order on the standing issue PRASA raised, despite the postponement of trial, but dismiss the evidentiary portion of the motion and allow PRASA to refile the motion on the evidentiary questions, if necessary, after the rescheduling of trial.  *Id.* at 2.  Third, the Court ordered counsel for the Plaintiffs in both cases to inform the Court of their position on formal consolidation.  *Id.* at 1-2.

On September 9, 2024, the respective Plaintiffs filed an essentially identical motion in each case in favor of consolidation.  *Mot. to Req. Consolidation*, No. 3:19-cv-01412-JAW (ECF No. 180); No. 3:19-cv-02131-JAW (ECF No. 207).  In both cases, PRASA responded in opposition on September 16, 2024, asking the Court to hold in abeyance the decision of whether to consolidate until after it resolved the pending motions for summary judgment and other pending matters.  *Def. PRASA's Resp. to*

---

[3]      At the status conference, José Luis Ramírez de Leon, Esq. represented the Plaintiffs in both cases.  *Status Order* at 1, No. 3:19-cv-01412-JAW (ECF No. 179); No. 3:19-cv-02131-JAW (ECF No. 206).  PRASA was jointly represented in both cases by A.J. Bennazar-Zequeira, Esq. and Idalia M. Diaz-Pedrosa, Esq.  *Id.*

*Pl.'s Req. for Consolidation*, No. 3:19-cv-01412-JAW (ECF No. 181); No. 3:19-cv-02131-JAW (ECF No. 208).  Upon review, on October 21, 2024 the Court ordered the cases consolidated pursuant to Federal Rule of Civil Procedure 42 "[b]ased on common questions of law, representation by the same attorneys, anticipated presentation of similar, though not identical, facts, the apparent similarity of expert witnesses, and interests of convenience and judicial economy."  *Order on Mot. to Consolidate* at 1, No. 3:19-cv-01412-JAW (ECF No. 182); No. 3:19-cv-02131-JAW (ECF No. 209) (*Consolidation Order*).  Recognizing PRASA's concerns regarding the cases' factual differences, the Court also noted that "distinguishable facts underlie each respective case" and "consolidation does not purport to eliminate the significance of these differences because, '[e]ven when consolidated, . . . each case's individuality and distinctness will remain.'"  *Id.* at 13-14 (first citing *Def. PRASA's Resp. to Pl.'s Req. for Consolidation* at 2) (then quoting *Norton Lilly Int'l v. P.R. Ports Auth.*, No. 18-1012 (GAG), 2019 U.S. Dist. LEXIS 2405245, at *4 (D.P.R. May 16, 2019)).

### D.    Oral Argument and Subsequent Filings[4]

On February 21, 2025, the Court held an oral argument on PRASA's respective motions in limine challenging Plaintiffs' standing and motions for summary judgment, during which the Court identified several deficiencies in the filings and ordered the parties to file responsive briefs within fourteen days and any responses within an additional fourteen days thereafter.  *Min. Entry* (ECF No. 186).   In

---

[4]      Unless otherwise noted, all docket entries subsequent to the cases' consolidation that are cited in this order are located in Docket No. 3:19-cv-01412-JAW.

compliance with this order, on March 7, 2025, Plaintiffs' counsel filed a motion seeking leave to amend the *Cebollero* complaint to clarify her alleged injury. *Mot. Seeking Leave to File Am. Compl.* (ECF No. 190). PRASA opposed Ms. Cebollero's motion to amend on March 21, 2025; despite its title, PRASA also included in this filing further arguments seeking dismissal of both cases for lack of standing. *PRASA's Opp'n to Pls.' Belated Mot. to Amend and Req. to Dismiss for Insufficient Pleadings and Continued Lack of Standing* (ECF No. 196) (*PRASA's Am. Compl. Opp'n*).

Separately, on March 7, 2025, PRASA filed a motion addressing the concerns the Court raised at oral argument. *PRASA's Mot. in Compliance with Order* (ECF No. 191) (*PRASA's Compliance Mot.*). Plaintiffs' counsel responded to PRASA's motion on March 25, 2025. *Pls.' Mot. in Resp. to PRASA's Mot. in Compliance with Order* (ECF No. 200) (*Pls.' Compliance Resp.*); *see also Mot. Seeking a Short Extension of Time for Cause* (ECF No. 197); *Order* (ECF No. 198); *Mot. Seeking an Additional Brief Extension of Time for Cause* (ECF No. 199), *Order* (ECF No. 203).

## II.    A PRELIMINARY NOTE ON THE COURT'S APPROACH

Due to the consolidation and the complicated procedural history of each case, the Court takes a moment to explain the approach it has taken for the purposes of this order. First, as the Court has previously recognized, "distinguishable facts underlie each respective case," *Consolidation Order* at 13-14; thus, in this order, the Court responds to the PRASA's pending motions to dismiss Plaintiffs' case for lack of

standing and for summary judgment and entry of judgment against Plaintiffs as a matter of law in *Reyes-Muñoz v. PRASA*, No. 3:19-cv-02131-JAW.[5]

Second, because "[s]tanding is a threshold issue in every federal case," *Me. Springs, LLC v. Nestlé Waters N. Am., Inc.*, No. 2:14-cv-00321-GZS, 2015 U.S. Dist. LEXIS 33259, at *12 (D. Me. Mar. 18, 2015) (citing *Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006)), after reviewing the factual record for the purposes of the pending motion in limine and motion for summary judgment, the Court begins by considering PRASA's challenge to Plaintiffs' standing to bring this case. Should the Court conclude Plaintiffs have satisfactorily established their legal standing, it will proceed to consider the merits of PRASA's argument for summary judgment.

## III.  FACTUAL BACKGROUND

### A.    Statement of Material Facts[6]

PRASA filed a motion for summary judgment within which it included a statement of material and uncontested facts. *PRASA's Summ. J. Mot.*, Section III ¶¶

---

[5]    To be clear given the cases' recent consolidation, PRASA has filed similar, but distinct, motions for summary judgment and to dismiss for lack of standing in *Cebollero-Bertrán v. PRASA*, No. 3:19-cv-01412-JAW. *See Cebollero-Bertrán v. PRASA*, No. 3:19-cv-0412-JAW, *Mot. for Summ. J.* (ECF No. 118); *Mot. in Lim. to Exclude Evid. and Args. Relating to Pls.' Lack of Standing* (ECF No. 156). To ensure "each case's individuality and distinctness [] remain[s]" intact, *Norton Lilly Int'l*, 2019 U.S. Dist. LEXIS 2405245, at *4, the Court contemporaneously issues a separate order to resolve the pending motions in *Cebollero*.

[6]    District of Puerto Rico Local Rule 56 instructs parties to submit supporting, opposing, and reply material facts, in each case, as "separate" statements. D.P.R. LOC. R. 56(a)-(c). In the present motion sequence, the parties did not submit separate statements, but instead included their statements of fact and responsive facts as subsections within their motions. The Court has thus designated the relevant subsections of the parties' respective motions according to the commonly used shorthands: Defendant's Statement of Material Fact (DSMF); Plaintiffs' Response to Defendant's Statement of Material Fact (PRDMSF); Plaintiffs' Statement of Additional Material Fact (PSAMF); Defendant's Reply to Defendant's Statement of Material Fact (DRDSMF); Defendant's Response to Plaintiff's Statement of Material Fact (DRPSAMF); Plaintiffs' Sur-reply to Defendant's Statement of

1-25 (DSMF).  Plaintiffs similarly included their answers to PRASA's statement of material facts in their response in opposition to summary judgment, *Pls.' Summ. J. Mot. Opp'n*, Section IV.A ¶ 8, (1)-(28) (PRDSMF), adding their own set of uncontroverted material facts within the same.  *Id.*, Section IV.B ¶¶ 9, (1)-(33) (PSAMF).[7]  PRASA's reply contains both its replies to Plaintiffs' answers to its assertions of fact, *PRASA's Summ. J. Reply* at Section II.B-D (DRDSMF), as well as its answers to Plaintiffs' asserted additional facts.  *Id.* at Section II.E (DRPSMF). Finally, in their sur-reply, Plaintiffs submit further objections to PRASA's assertions of material fact, *Pls.' Summ. J. Sur-reply*, Section II ¶¶ 5-25 (PSDSMF), and also respond to PRASA's answers to their asserted additional facts.  *Id.*, Section III ¶¶ 27-39 (PSPSAMF).

### 1.  The Parties

PRASA, a public corporation statutorily created by 22 L.P.R § 141 *et seq.*, provides water and sewer services for Puerto Rico, including a residential wastewater treatment plant in the Puerto Nuevo area.[8]  DSMF ¶ 1; PRDSMF ¶ 1.

---

Material Fact (PSDSMF); and Plaintiff's Sur-reply to Plaintiff's Statement of Additional Material Fact (PSPSAMF).

[7]     The Court notes that Plaintiffs' statement of additional material facts skips numbers 16 and 17 in its list.  *See Pls.' Summ. J. Opp'n* at 20-21.  However, to avoid confusion in references to particular facts, the Court will refer to the statement of additional facts by the numbers assigned by Plaintiffs, despite this unexplained gap.

[8]     Plaintiffs first assert this statement is a matter of law, not fact, and as such it need not be accepted or denied.  PRDSMF ¶ 1.  In the alternative, they accept it.  *Id.*  Plaintiffs provide no legal basis for their assertion that an organic statute which by its facial terms creates a government entity is a matter of law; the Court thus deems this statement of fact admitted.

Noel Reyes-Muñoz and Olga Ramos-Carrasquillo, a married couple, have resided in the La Serranía residential community in Caguas, Puerto Rico at all times relevant to this case. DSMF ¶ 2; PRDSMF ¶ 2.  On June 16, 2014, Plaintiffs bought a house (the Cidra property) located at Villa Guanime Street state road 172, Km 12 Hm 0, Bayamón Ward, Cidra, Puerto Rico.  DSMF ¶ 3; PRDSMF ¶ 3.  Plaintiffs have never lived on the Cidra property.[9]  DSMF ¶ 3.

Around the year 2018, Pedro Colón moved to the Cidra property as Plaintiffs' tenant and continues to reside there.[10]  DSMF ¶ 6; PRDSMF ¶ 6.  As a tenant, Mr. Colón pays Plaintiffs USD $1,000.00 in monthly rent.  PRDSMF ¶ 6.  Mr. Colón leaves the Cidra property daily at around noon and returns at night.[11]  DSMF ¶ 13.

---

[9]    Plaintiffs deny this part of PRASA's statement, averring "Plaintiff Noel Reyes spent a year remodeling the property, and was there most of the time by 2014-2015."  PRDSMF ¶ 3 (citing *Pls.' Summ. J. Opp'n*, Attach. 1, *Taking of the Deposition of Mr. Noel I. Reyes-Muñoz* at 43:14-19 (*Reyes Dep. Tr.*); *see also Mot. Submitting Translated Exs.* (ECF No. 173) (*Pls.' Translated Exs.*), Attach. 1, *Taking of the Deposition of Mr. Noel I. Reyes-Muñoz* (*Pls.' Reyes Translated Dep. Tr.*)).  Mr. Reyes's deposition transcript notes his work renovating the property but states he did not ever live in it, instead immediately posting it for rent upon completion of the renovations.  *Pls.' Reyes Translated Dep. Tr.* at 8 (as the Plaintiffs' translated exhibit does not contain page numbers, the Court's citations reflect the pagination of the PDF filed on the ECF platform).  PRASA's proposed fact is admitted.

[10]    PRASA's statement also includes allegations that "the Plaintiffs cannot claim irreparable loss of their property since they have been uninterruptedly deriving economic benefits from leasing the Cidra house," and "cannot complain about the alleged raw sewage dump in the land and exposure to foul odors and health risks, because they do not reside at the allegedly affected property."  DSMF ¶ 6.  Plaintiffs deny these averments.  PRDSMF ¶ 6.  At the summary judgment stage, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation."  *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).  The Court revises the statement to include only the undisputed factual portion supported by the record and will consider PRASA's legal arguments in the Discussion portion of this order, where relevant.  Plaintiffs also respond that Mr. Colón pays them USD $1,000.00 in monthly rent.  PRASA does not contest this assertion in its reply and it is thus deemed admitted.

[11]    Plaintiffs dispute this fact, arguing Mr. Reyes's deposition only describes Mr. Colón as holding "a nightly shift."  PRDSMF ¶ 13.  On review of Mr. Reyes deposition transcript, he stated: "Pedro has his evening schedule, so he comes in at noon and leaves at night."  *Mot. Submitting Translated Exs.* (ECF No. 156), Attach. 1, *Taking of the Dep. of Noel Reyes-Muñoz* at 27 (*PRASA's Reyes Translated Dep. Tr.*).  The Court thus deems this fact admitted.  However, PRASA also includes in its statement

### 2.    The 2015 Consent Decree[12] between PRASA and EPA

Listing the general requirements covering overflows, spills, and releases from all facilities in the PRASA system, Article XVIII of the 2015 Consent Decree between EPA and PRASA requires PRASA to implement a Spill Response and Cleanup Plan (SRCP) summarizing actions to be taken by PRASA to address Sanitary Sewer Overflows (SSOs), unauthorized releases, and combined sewer overflows from all facilities, including all sewer systems owned and/or operated by PRASA.  DSMF ¶ 18; PRDSMF ¶ 18.

The SRCP specifies a standardized course of action to follow in the event of a sewer overflow from a PRASA facility and obligates PRASA to develop procedures for response, cleanup, investigation, and mitigation of sewer overflow events.  DSMF ¶ 19; PRDSMF ¶ 19.  PRASA has complied with this 2015 Consent Decree obligation by developing standard procedures.  DSMF ¶ 19; PRDSMF ¶ 19.

To implement the needed remedial measures contemplated in the 2015 Consent Decree, due to the magnitude of the identified projects and PRASA's limited financial resources, a prioritization system was adopted.  DSMF ¶ 20; PRDSMF ¶ 20. The 2015 Consent Decree's prioritization system was jointly developed by PRASA's infrastructure officials and its consultants, with key participation of an independent

---

of fact "[t]hus, any alleged exposure to foul odors and health risks is minimal," which Plaintiffs deny. DSMF ¶ 13; PRDSMF ¶ 13.  As explained in the previous footnote, on a motion for summary judgment, the Court does not accept "conclusory allegations."  *Mancini*, 909 F.3d at 38 (quoting *Ahern*, 629 F.3d at 54).  The Court therefore limits the fact to the verifiable portion of the statement.

[12]    Both parties refer to the Consent Decree between PRASA and EPA as the "2015 Consent Decree," despite it being entered in the District of Puerto Rico, Civil No. 15-2283 (JAG) on May 23, 2016.  *See, e.g., Pls.' Summ. J. Opp'n* at 18; *PRASA's Summ. J. Reply* at 13.  In the interest of consistency, the Court adopts the parties' preferred nomenclature.

advisory committee that reviewed and provided comments regarding the methodology, ranking criteria, and its associated weighting, as well as with input from representatives of both the United States Department of Health and EPA. DSMF ¶ 20; PRDSMF ¶ 20.

The prioritization system has been developed for three project types: water projects, wastewater projects, and sludge treatment systems (STS) projects. Each prioritization system has been developed taking into consideration regulatory and environmental compliance, operational requirements and needs, as well as population served, among other characteristics. DSMF ¶ 21; PRDSMF ¶ 21.

Under the SRCP, the Consent Decree states that PRASA should utilize a form specifically designed by EPA in Appendix N to report every Unauthorized Release and SSO that occurs from a point not authorized by a National Pollutant Discharge Elimination System (NPDES) Permit, and also required PRASA to update the SRCP every year afterwards. PSAMF ¶ 18; DRPSAMF ¶ 18. Section 4.2.2 of the SRCP instructs that after the cause of the sewer overflow is corrected, a post-event investigation is required, and a root cause analysis is needed. PSAMF ¶ 19; DRPSAMF at 11.[13]

---

[13]     PRASA does not respond to Plaintiffs' statement of additional facts with an enumerated list of admittances and denials, but instead lists the admitted facts in a single unenumerated paragraph on page eleven of its response. *See PRASA's Summ. J. Reply* at 11. The Court thus cites this page number in reference to undisputed facts, rather than a paragraph citation. However, as PRASA responds to disputed or qualified facts with reference to individual paragraphs, the Court will reference these replies by paragraph number.

### 3.   The 2017 Hurricane Season and its Effects on Puerto Rico

On September 6, 2017, Puerto Rico experienced a Category 5 hurricane, Hurricane Irma.  The storm passed through the northern part of the island, and PRASA suffered damage to its water treatment facilities and other structures.  DSMF ¶ 4; PRDSMF ¶ 4.

Then, on September 20, 2017, Puerto Rico was hit by Category 4 Hurricane María, which severely impacted all PRASA's infrastructure across the island.  DSMF ¶ 5; PRDSMF ¶ 5.  The flooding and loss of electrical power system resulted in a shutdown of most of the water supply, wastewater treatment plants, and pumping stations.  DSMF ¶ 5; PRDSMF ¶ 5.  Sewage water contaminated the streets, rivers, and sea, posing an immediate threat to the environment, public health, and safety. DSMF ¶ 5; PRDSMF ¶ 5.

### 4.   Consulting Engineer's Reports

#### a.   2018 Consulting Engineer's Report

In August of 2018, PRASA published the "Fiscal Year 2018 Consulting Engineer's Report for the Puerto Rico Aqueduct and Sewer Authority" (2018 CER) written for Efrain Acosta, then the Executive Director of Finance of PRASA, by Melissa Pomales, P.E., Luis A. Santiago, P.E., and Jose E. Rosich, P.E. from the consulting firm Arcadis Caribe, P.S.C. (Arcadis).  PSAMF ¶ 1; DRPSAMF at 11.

The 2018 CER was prepared by Arcadis as required by Section 7.07 of the Master Agreement of Trust (MAT), "to prepare a CER to document the current condition and changes, if any, in PRASA's operation and the performance of the water and wastewater systems (the System).  Also, PRASA must maintain a continuous

disclosure policy with its Fiscal Agent and satisfy certain reporting requirements throughout the fiscal year (FY)."  PSAMF ¶ 3; DRPSAMF at 11.

In the 2018 CER, Arcadis stated that it "has been retained by [PRASA] as its Consulting Engineer to assist in the preparation of the [CER] to satisfy the reporting requirements specified in Section 7.07 of the 2012 amended and restated Master Agreement of Trust by and between PRASA and Banco Popular de Puerto Rico as Trustee, as further amended, and the requirements between PRASA, the Government of Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym) as Fiscal agent to PRASA."  PSAMF ¶ 2; DRPSAMF at 11.

In the 2018 CER, Arcadis reported that it assessed the condition of PRASA's system through an inspection program of a sample of facilities that included a selection of the major elements of the system.  PSAMF ¶ 4; DRPSAMF at 11.

In its conclusions set forth in Section 4.4 of the 2018 CER, Arcadis stated that "[t]he condition of PRASA's facilities has continued to deteriorate because the lack of funding has significantly prolonged and adversely impacted the implementation of PRASA's [capital improvement program (CIP)] and key initiatives and has reduced [replacement and renewal (R&R)] investments."  PSAMF ¶ 5; DRPSAMF ¶ 5.  The facilities were damaged during the 2017 hurricanes, after which Arcadis visited a total of 415 facilities throughout PRASA's five Operational Regions between October 2017 and May of 2018.[14]  DRPSAMF ¶ 5; *Pls.' Summ. J. Sur-reply* at 13.  The 2018

---

[14]    PRASA admits PSAMF ¶ 5, adding the qualifications that "Arcadis visited a total of 415 facilities throughout PRASA's five Operational Regions between October 2017 and May of 2018" and

CER states that, since the hurricanes, most of PRASA's facilities have been brought to operational status and are expected to continue to serve their intended operational purpose.  DRPSAMF ¶ 5; *Pls.' Summ. J. Sur-reply* at 13.

In the 2018 CER, Arcadis further stated that "[o]verall, a declining trend in asset conditions was observed across all asset classes, as a result of the suspension of the CIP since FY2016, reduction of the R&R program due to the fiscal situation and budget limitations, and further exacerbated by the 2017 hurricanes.  PRASA must reactivate its CIP and R&R program to improve the performance of its facilities and slow down any further deterioration of equipment and/or life expectancy of these assets."  PSAMF ¶ 6; DRPSAMF ¶ 6.  The 2018 CER also references a list of projects for funding to the Federal Emergency Management Agency (FEMA) and their insurance provider to partially fund repairs to PRASA's facilities.[15]  DRPSAMF ¶ 6; *Pls.' Summ. J. Sur-reply* at 13.

Section 6.5.3.1 of the 2018 CER provides information about the status of PRASA's compliance with the terms and conditions of the 2015 Consent Decree. PSAMF ¶ 7; DRPSAMF at 11.  Section 6.5.3.1 indicates PRASA was in noncompliance with the 2015 Consent Decree due to "Force Majeure" impact of Hurricanes Irma and María during September 2017.  PSAMF ¶ 8; DRPSAMF ¶ 8.  The 2018 CER notes

---

that "[m]ost of the facilities have been brought to operational status and are expected to continue to serve their intended operational purpose."  DRPSAMF ¶ 6.  Plaintiffs' sur-reply explains it only addresses PRASA's responses to PSAMF ¶¶ 26, 29, 30, and 33 and does not dispute PRASA's qualification of PSAMF ¶ 5, *Pls.' Summ. J. Sur-reply* at 13; these qualifications are deemed admitted.

[15]    PRASA admits PSAMF ¶ 6 and adds the qualification that the 2018 CER also lists FEMA- and insurer-funded projects.  DRPSAMF ¶ 6.  As Plaintiffs do not dispute PRASA's qualification of PSAMF ¶ 6 in their sur-reply, *Pls.' Summ. J. Sur-reply* at 13, this qualification is deemed admitted.

that "[u]p to September 2017, PRASA had been in significant compliance with the Consent Decree. Yet pressed by the aftermath of the 2017 hurricanes, the efforts needed to restore the system and sustain operations, in most cases with auxiliary power (emergency generators), made continued work pursuant to the consent decree extremely difficult and in some cases impossible. To such effect, PRASA requested Force Majeure protection for ongoing and upcoming work and deadlines and stipulated penalties under the 2015 [] Consent Decree."[16] DRPSAMF ¶ 8; *Pls.' Summ. J. Sur-reply* at 13. Section 6.5.3.1 does not state that PRASA had satisfied the terms and conditions set forth in the 2015 Consent Decree.[17] PSAMF ¶ 9; DRPSAMF ¶ 9.

### b.    2019 Consulting Engineer's Report

By December 2019, PRASA published the "Fiscal Year 2019 Consulting Engineer's Report for the Puerto Rico Aqueduct and Sewer Authority" (2019 CER). written for Mr. Acosta as PRASA's then the Executive Director of Finance by Arcadis Engineers Pomales, Santiago, and Rosich. PSAMF ¶ 10; DRPSAMF at 11.

Section 6.5.3.1 of the 2019 CER again provides information about the status of PRASA's compliance with the terms and conditions of the 2015 Consent Decree. PSAMF ¶ 11; DRPSAMF at 11. The 2019 CER reports a significant increase in

[16]    PRASA admits the statement, but adds that, prior to the hurricanes, it had been in substantial compliance with the terms of the 2015 Consent Decree by quoting the 2018 CER. DRPSAMF ¶ 6 (quoting *PRASA's Summ. J. Reply*, Attach. 4, *Fiscal Year 2018 Consulting Eng'r's Report for [PRASA]* at 6:15-22 (*2018 CER Excerpts*)). Plaintiffs do not dispute this qualification in their sur-reply, *Pls.' Summ. J. Sur-reply* at 13, so this qualification is deemed admitted.

[17]    PRASA admits this fact, with the added qualifier that that the 2018 CER states "significant compliance with the consent decree" prior to September 2017. DRPSAMF ¶ 9 (quoting *2018 CER Excerpts* at 6:15-22). Plaintiffs do not dispute this qualification. As the Court has already incorporated the language from the 2018 CER regarding the state of pre-hurricane compliance with the 2015 Consent Decree, the Court deems this fact admitted.

pending overflows compared to the last reported fiscal year.  PSAMF ¶ 12; DRPSAMF ¶ 12.  The 2019 CER further notes "FY2019 reflects the effects of the 2017 Hurricanes as all criteria increased significantly from the last reported available data, in FY2017."[18]  DRPSAMF ¶ 12; *Pls.' Summ. J. Sur-reply* at 13.  The 2019 CER does not include any mention of SSOs affecting the Lake Cidra area, nor any capital improvement proposals to correct the problem.  PSAMF ¶ 12; DRPSAMF at 11.

### c.    2020 Consulting Engineer's Report

By December 2020, PRASA published the "Fiscal Year 2020 Consulting Engineer's Report for the Puerto Rico Aqueduct and Sewer Authority" (2020 CER), written by Arcadis Engineers Pomales, Santiago, and Rosich.  PSAMF ¶ 14; DRPSAMF at 11.  The 2020 CER does not specifically mention SSOs affecting the Cidra Lake area, nor any capital improvement proposals to correct the problem, though the report does not categorize any SSOs by municipality.[19]  PSAMF ¶ 15; DRPSAMF ¶ 15.

---

[18]    PRASA admits this fact, with the added qualifier that that the 2019 CER explains the increase as a result of the 2017 hurricanes.  DRPSAMF ¶ 12 (quoting *PRASA's Summ. J. Reply*, Attach. 5, *Fiscal Year 2019 Consulting Eng'r's Report for [PRASA]* at 4-39 – 4-34 (*2019 CER Excerpts*)).  In their sur-reply, Plaintiffs do not respond to this qualification, *Pls.' Summ. J. Sur-reply* at 13; thus, the qualification is deemed admitted.

[19]    PRASA admits Plaintiffs' asserted fact that the 2020 CER does not mention SSOs affecting Cidra but qualifies that the 2020 CER does not categorize SSOs by municipality.  DRPSAMF ¶ 15.  Plaintiffs do not dispute this qualification, so it is deemed admitted. However, PRASA also asserts "PRASA's improvements to manage the overflows allegedly affecting Plaintiffs were directly addressed by USEPA's Mr. Jaime Géliga, at the public comment phase for the approval of the modifications of the 2015 Consent Decree."  DRPSAMF ¶ 15 (citing *PRASA's Summ. J. Reply*, Attach. 2, *Decl. of Jaime A. Géliga*).  "When evaluating a proper qualification or denial and additional facts, the Court must decide whether 'a party's denial or qualification of a proposed fact [is] strictly limited to the issue therein raised.'"  *Martínez-Suárez v. Mansiones De Garden Hills Apartments*, 556 F. Supp. 3d 1, 7 (D.P.R. 2021) (quoting *Acevedo-Padilla v. Novartis Ex Lax, Inc.*, 740 F. Supp. 2d 293, 298 (D.P.R. 2010), *rev'd and remanded on other grounds*, 696 F.3d 128 (1st Cir. 2012)).  Here, the issue raised by Plaintiffs' statement of fact is the contents of the 2020 CER.  Statements made by EPA officials as part

### 5.    Sewage Overflows and Reporting to PRASA

Mr. Colón, Plaintiffs' tenant at the Cidra property, sporadically called Carmen Rivera González, PRASA's compliance specialist for the Cidra area, when there were overflows in the manhole in front of Plaintiffs' property.[20]  DSMF ¶ 12.  Whenever there was an SSO, Mr. Reyes communicated by email and through personal visits with several EPA staff, mainly Lalitza Lopez and Héctor Ortiz.  Because of those visits, Mr. Reyes managed to have a meeting with EPA and PRASA personnel, including Jimmy Solivan and Carmen Rivera, on November 20, 2015.  PSAMF ¶ 29; DRPSAMF at 11.  Plaintiffs were not present at the Cidra Lake property when the manhole overflow events alleged in the complaint occurred in 2019 and only have videos of the alleged events taken by their tenant.[21]  DSMF ¶ 16.

---

of a separate proceeding are beyond the scope of this issue; thus, the Court declines to admit this qualification.

[20]    Plaintiffs deny this statement, asserting "[c]ommunications are also by text messages, and some contained videos of the overflows."  PRDSMF ¶ 12 (citing *Pls.' Summ. J. Opp'n*, Attach. 2, *Taking of the Dep. of: Ms. Carmen Rivera-González* at 27:1-12, 31:12-23, 32:2-10 (*Rivera Dep. Tr.*)).  In reviewing the cited attachment, however, the Court notes that pages twenty-seven and thirty-one are not included in the excerpts submitted by Plaintiffs.  Page thirty-two is included and describes conversations via the application WhatsApp, but does not clarify whether these conversations were oral or via text message, both of which could be supported through WhatsApp.  *See Rivera Dep. Tr.* at 32:2-10.  The Court thus admits PRASA's statement in full.

PRASA further states that "[p]rior to the 'Notice of Intent', Mr. Noel Reyes never contacted PRASA to report the alleged overflows."  DSMF ¶ 14 (citing *Reyes Dep. Tr.* at 61:21-25); *see also PRASA's Reyes Translated Dep. Tr.* at 61 ("Q. Aside from the meeting you had with . . . Lalitza López, which Jimmy Sullivan and Carmen Rivera went, how many times did you go to [PRASA] to report the situation related to the overflows? A. No, never") (transcript edited by Court for clarity).  Plaintiffs dispute this statement, submitting that Mr. Reyes also testified as to direct communications with PRASA officials.  PRDSMF ¶ 14 (citing *Reyes Dep. Tr.* at 42:5-17, 50:17-22; *id.*, Attach. 3, *Taking of the Dep. of Mr. Jimmy Solivan* at 76-78 (*Solivan Dep. Tr.*)); *see also Pls.' Reyes Translated Dep. Tr.* at 6-7, 13.  Based on the evidence submitted by Plaintiffs of Mr. Reyes reporting direct communications with PRASA officials, the Court declines to admit PRASA's proffered statement of fact.

[21]    In support of its proposed fact, PRASA cites statements from Mr. Reyes deposition to the effect that his tenant, Mr. Colon, recorded videos of the overflow events.  DSMF ¶ 16 (citing *Reyes Dep. Tr.* at 86:14-18, 87:14-18); *see also PRASA's Reyes Translated Dep. Tr.* at 86-87.  Plaintiffs dispute this statement, submitting Mr. Reyes "testified amply that he saw overflows from the concerned manholes,

PRASA's Expert Engineer, José Martí, reported that he did not see any post-remedial investigations of any SSOs in the Cidra area as required by the SRCP, and did not include them in his report to EPA.[22]  PSAMF ¶ 20; DRPSAMF ¶ 20.  Only one case of a SSO in the Villa Guanime Street, where Plaintiffs' property is located, was reported to EPA as occurring on April 1, 2016.  PSAMF ¶ 21; DRPSAMF at 11.  PRASA does not conduct root-cause analysis because it asserts "they are not required by law."  PSAMF ¶ 22; DRPSAMF at 11.

In a little more than one year, from 2015 to 2016, there were nine documented SSOs in the Treasure Valley Pump Station, which revealed an infrastructural problem causing frequent power failures; this breakdown of the Treasure Valley Pump Station was one of the main causes of the SSOs in the Villa Guanime area.  PSAMF ¶ 23; DRPSAMF at 11.

---

since 2015, and up to 2018."  PRDSMF ¶ 16.  As PRASA replies, the statement of fact concerns "alleged manhole overflow events alleged in the complaint," which only alleges sewage discharges "occur[ing] on the following dates: February 12, 14, 2019; March 28, 2019; May 14, 2019; June 10, 14, 2019; August 2, 2019." *DRDSMF* ¶ 16; *Compl.* ¶ 13.  Statements regarding overflows from 2015 to 2018, thus, are beyond the "the issue therein raised. *Martínez-Suárez*, 556 F. Supp. 3d at 7 (quoting *Acevedo-Padilla*, 740 F. Supp. 2d at 298).  Further, the portion of Mr. Reyes's deposition cited by PRASA supports its assertion of fact. *See PRASA's Reyes Translated Dep. Tr.* at 86-87 (Q. Since 2018, Pedro is the one who has recorded the videos? A. Um-hmm.  Q. And he would send them to you? A. Yes"); *id.* ("Q. Okay.  In other words, we can be clear in that if Pedro was the one who would send you the videos of the 2019 overflowing incidents, it was because you were not present?  A. Yes").  Based on this record and the inappositeness of Plaintiffs' denial, the Court deems this statement admitted in full.

[22]    PRASA admits this fact but adds that "both PRASA and the EPA were aware of the overflows affecting Plaintiffs property, its causes and the measures that were being taken to improve and solve the situation."  DRPSAMF ¶ 20 (citing *Decl. of Jaime A. Géliga*).  "A party's denial or qualification of a proposed fact [is] strictly limited to the issue therein raised." *Martínez-Suárez*, 556 F. Supp. 3d at 7 (quoting *Acevedo-Padilla*, 740 F. Supp. 2d at 298).  Here, whether PRASA's engineer identified the required post-remedial investigations and reported the same to EPA is a separate issue from whether PRASA and EPA became aware through other means, including through the public comment period described in Mr. Géliga's declaration from years after the events described.  The Court thus declines to admit PRASA's proposed qualification to this statement of fact.

As Compliance Specialist in PRASA's Cayey area, one of Ms. Rivera's duties under the SCRP is to report SSOs to EPA.  PSAMF ¶ 24; DRPSAMF at 11.  Problems at the Treasure Valley Pump Station are reported to Ms. Rivera, though she does not receive complaints regarding SSOs in the Cidra area from PRASA's webpage.  PSAMF ¶ 25, 27; DRPSAMF at 11.  Ms. Rivera reported to EPA the existence of SSO events in 2024.[23]  PSAMF ¶ 26; DRPSAMF ¶ 26.

### 6.    Communications with EPA

On May 8, 2019, Carmen Guerrero Perez, EPA's Caribbean Environmental Protection Division Director, answered an email from Mr. Reyes sent on April 9, 2019 about an alleged fish kill in Lake Cidra and sewage contamination as result of alleged discharges from a PRASA sewer line.  DSMF ¶ 7; PRDSMF ¶ 7.  In her responsive email, Ms. Guerrero explained to Mr. Reyes that PRASA had indicated that the main problem with the sanitary sewer system was that it is affected by infiltration inflows (I/I) during periods of heavy rain, and to that extent, EPA had included in the existing 2015 Consent Decree the evaluation of the sanitary sewer system to define the I/I

---

[23]    Plaintiffs submit the fact that "[t]here were problems with the Treasure Valley Pump [S]tation just prior to [Ms. Rivera's] deposition meaning that the unauthorized SSOs are still ongoing."  PSAMF ¶ 20 (citing *Rivera Dep. Tr.* at 32:7-10).  PRASA disputes this statement as unsupported by the record.  On review by the Court, the cited colloquy states: "Q. Would I be correct when – the last time he reported to you another overflow was on February 6th of this year?  A. I am aware that there were this year.  There were very heavy rains, yes.  But that . . ."  In their sur-reply, the Plaintiffs contend "Ms. Rivera admitted that there were overflows happening even last February, which meant that the unauthorized discharges of sewage were continuing, suggesting that the Treasure Valley [P]ump [S]tation was also having problems."  *Pls.' Summ. J. Sur-reply* at 14.  At the summary judgment stage, the Court accepts facts but disregards, inter alia, "conclusory allegations."  *Mancini*, 909 F.3d at 38 (quoting *Ahern*, 629 F.3d at 54).  The Court therefore revises the statement of fact to reflect only the fact that there were overflow events in 2024 and declines to admit Plaintiffs' imputation to the Treasure Valley Pump Station as unsupported by the record.

problems followed by the identification of necessary corrective measures and their implementation.  DSMF ¶ 7; PRDSMF ¶ 7.

Ms. Guerrero further informed Plaintiffs that the 2015 Consent Decree "is currently being modified to include new capital improvements projects needed due to the impacts to water and wastewater infrastructure caused by Hurricanes Irma and María.  Notwithstanding, the project to inspect and address the sanitary sewer system that affects Cidra Lake will continue to be part of the [2015 Consent Decree] and PRASA will be required to proceed with it."[24]  DSMF ¶ 8; PRDSMF ¶ 8.

Ms. Guerrero concluded her letter by telling Plaintiffs that EPA will continue to work directly with PRASA to ensure that sewage overflows are minimized in Cidra Lake, that the necessary infrastructure projects are completed, and a final solution is achieved. DSMF ¶ 11; PRDSMF ¶ 11.

---

[24]    PRASA submits two other facts based on Ms. Guerrero's letter: that "EPA requested PRASA personnel to visit the area periodically to ensure that the sanitary system is maintained clean and fully operational minimizing the recurrence of sewage overflows" and that "PRASA hired a contractor to perform a water quality investigation and a biological study of aquatic species of Cidra Lake." DSMF ¶¶ 8-9 (citing *PRASA's Summ. J. Mot.*, Attach. 3, *EPA's E-mail to Pls.* ¶¶ 3-4).  Plaintiffs dispute these proffered facts, arguing that statements in EPA's letter do not prove the asserted actions—to wit, periodic inspections and a study of Cidra Lake—actually occurred.  PSDSMF at 6-7.

District of Puerto Rico caselaw is clear that statements of material fact must be "supported by pin cites to admissible evidence."  *Portugues-Santa v. B. Fernandez Hermanos, Inc.*, 614 F. Supp. 2d 221, 227 (D.P.R. 2009) (citing P.R. LOC. R. 56(b), (c) & (e)).  Relying on statements made in EPA's letter, which itself professes its belief in DSMF ¶ 8 based on statements made by PRASA, appears to constitute hearsay and thus would likely be inadmissible at trial to prove the truth of such facts.  The Court therefore declines to admit these facts for the purposes of the present motion for summary judgment.

None of the communications that Mr. Reyes received from EPA had any reference to any action by the EPA against PRASA to correct the unauthorized SSOs.[25]  PSAMF ¶ 30.

### 7.    PRASA's Sewer System and Improvement Projects

The manholes identified in the complaint are associated with PRASA's Treasure Valley Pump Station, which in turn transmits the collected wastewater to PRASA's Cayey Wastewater Treatment Plant (Cayey WWTP).  The Treasure Valley Pump Station and identified manholes are portions of the Cayey WWTP and are covered by the 2015 Consent Decree.  DSMF ¶ 17; PRDSMF ¶ 17.

In the Cidra area, PRASA completed Capital Improvement Project (CIP) 3-21-5020, alternatively called REN-372001, which included the replacement of a sixteen-inch diameter pipeline at the bridge in state road 172, on August 10, 2022.  DSMF ¶ 22; PRDSMF ¶ 22.  No additional projects were completed related to the sanitary pipes near the areas relevant to this case.[26]  DSMF ¶ 22; PRDSMF ¶ 22.  Two

---

[25]    In support of its proposed fact, PRASA cites statements from Mr. Reyes's deposition that EPA did not describe any enforcement actions taken against PRASA in its responses to his complaints. PSAMF ¶ 30 (citing *Reyes Dep. Tr.* at 62:3-18); *see also Pls.' Reyes Translated Dep. Tr.* at 14.  PRASA objects to this statement of additional facts by Plaintiffs, arguing that the statement is too vague in its failure to include dates, refer to particular communications received from PRASA or EPA, or relate the statement to the facts alleged in the complaint.  DRPSAMF ¶ 30.  The Court concludes PRASA's position inverts the summary judgment burden.  Plaintiffs make a broad statement, supported by a citation to Mr. Reyes's deposition.  *See Pls.' Reyes Translated Dep. Tr.* at 14 ("Q. Beyond that. . . what did EPA do, in respect to Lalitza . . . attending, and Héctor Ortiz receiving the e-mails, did EPA help you out? Beyond that, no? A. Absolutely nothing").  Under Local Rule 56, PRASA's denial must be supported by a record citation.  D.P.R. LOC. R. 56(d).  PRASA's denial did not do so; indeed, given the breadth of Plaintiff's statement, as pointed out by PRASA itself, it could have supported a denial with any example of EPA communications to Mr. Reyes referencing action by EPA against PRASA to correct unauthorized SSOs.  Based on PRASA's failure to do so, the Court deems the fact admitted in full for the purposes of the motion for summary judgment.

[26]    In full, PRASA submits that "PRASA has prioritized projects in the Cidra area, by investing in several CIP (Capital Improvement Projects), to pursue the goals of minimizing and eventually eliminating the sanitary sewer discharges in Cidra Lake. An example of said CIP projects is project

additional PRASA CIP projects are directed to minimize or eliminate the discharges in Cidra Lake; first, CIP 3-21-5021 for the design and construction of improvements to lines of force and Sanitary Sewage Pump Station (SSPS) in Ciudad Jardín, which received American Rescue Plan Act funding in the amount of $2,419,506. DSMF ¶ 23; PRDSMF ¶ 23. The planning phase of this project began in August 2023 and anticipates benefitting the Treasure Valley SSPS because part of the sanitary discharge received by Treasure Valley Pump Station will be redirected to Ciudad Jardín's SSPS. DSMF ¶ 23; PRDSMF ¶ 23. Second, CIP 0-80-0074E for buying and replacement of power generators began on May 23, 2022, and was expected to be finished by February 2024.[27] DSMF ¶ 23; PRDSMF ¶ 23. The Treasure Valley's

---

number 3-21-5020 for replacement a 16" diameter pipeline at the bridge in road 172, completed on August 10, 2020." DSMF ¶ 22 (citing *PRASA's Summ. J. Mot.*, Attach. 11, *PRASA's Answer to First Set of Interrogs.* (*PRASA's Interrogs. Answer*) (citation corrected)). Plaintiffs deny this statement, arguing that the cited interrogatory "only states that '[t]he project REN-372001 was completed on August 10, 2020. This project included the replacement of a 16" diameter pipeline at the bridge in road 172. No additional projects were completed related to the sanitary pipes near the areas requested.'" PRDSMF ¶ 22 (citing *PRASA's Summ. J. Mot.*, Attach. 11, *PRASA's Interrogs. Answer* (citation corrected)) (Plaintiffs' emphasis). Based on its review of the record and its obligation at summary judgment to exclude "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation," *Mancini*, 909 F.3d at 38 (quoting *Ahern*, 629 F.3d at 54), the Court narrows the statement of fact to include only a description of the undisputed project CIP 3-21-5020, without an inference of prioritization or other projects not evidenced by the record. Further, the Court notes the conflict between the date of completion, 2022 versus 2020, stated in the answer to the interrogatory and as stated by PRASA in its summary judgment motion. Viewing all facts and drawing all reasonable inferences in favor of the nonmoving party, *Ophthalmic Surgeons, Ltd.*, 632 F.3d at 35, the Court adopts the later date of August 10, 2022 in this statement of fact.

27        PRASA further asserts that "[t]elemetry improvements were also made to the Pump Stations and pipelines at Cidra to monitor and prevent overflows." DSMF ¶ 24 (citing *Solivan Dep. Tr.* at 45:11-25, 62:9-17). Plaintiffs deny this statement, arguing that "[t]he answers were vague enough not to support the statement as worded." PRDSMF ¶ 24. To resolve this dispute, the Court consulted the record. As an initial matter, page sixty-two, as cited by PRASA, is not included in the excerpts of Mr. Solivan's deposition attached to its motion. *See Solivan Dep. Tr.* Although the Court has no obligation to review the record beyond the pin citations provided by the parties, the Court independently considered page forty-five, which states, in full:

THE DEPONENT: Treasure Valley, Cidra 1 --

power generator cost \$161,448 and after repairs were made to the Treasure Valley Pump Station, the reports of overflows diminished considerably.[28]  DSMF ¶ 25.

---

ATTY. BELAVAL-BRUNO: Treasure Valley.

THE DEPONENT: -- Cidra 2. "¿Qué más? Asi, qué me acuerde. . . ¿Hasa que fecha del 19 --

ATTY. BELAVAL-BRUNO: "And, that I remember -.

ATTY DÍAZ-PEDROZA: "Diciembre".

ATTY. BELAVAL-BRUNO: -- up to December 2019.

ATTY. DÍAZ -PEDROZA: "Diciembre 20".

THE DEPONENT: "Diciembre -- diciembre del 19, de telemetría, se hicieron mejoras en telemetría".

ATTY. BENNAZAR-ZEQUEIRA: Translate that, please.

ATTY. BELAVAL-BRUNO: I have no idea.

MR. RODRIGUEZ-HERNANDEZ: In telemetry.

ATTY. DÍAZ -PEDROZA: Telemetry.

THE DEPONENT: Telemetry, to the telemetry systems.

*Solivan Dep. Tr.* at 45:11-25.  The Court deems this exchange confusing and vague, and thus concludes that it does not plainly support the statement that telemetry improvements were made to the Pump Stations and pipelines at Cidra to monitor and prevent overflows as articulated by PRASA's proposed facts.  Viewing all facts and drawing all reasonable inferences in favor of the nonmoving party, *Ophthalmic Surgeons, Ltd.*, 632 F.3d at 35, the Court declines to admit PRASA's proposed statement of fact.  PRASA's reply submits additional evidence in support of its statement that telemetry improvements were made.  *See PRASA's Summ. J. Reply* at 10 (citing *id.*, Attach. 1, *Invoice*); *see also Mot. Submitting Translated Exs.*, Attach. 1., *Invoice* (ECF No. 180) (*Translated Invoice*)).  However, the District of Puerto Rico Local Rules are clear that a reply statement of material fact "shall be limited to any additional fact submitted by the opposing party."  D.P.R. LOC. R. 56(d).  As PRASA presents this new evidence as independent support of its own proposed fact, not to dispute the Plaintiffs' additional facts, the Court will not consider it as independent support for DSMF ¶ 24.

[28]      In full, PRASA asserts "After repairs were made to the Treasure Valley Pump Station, the reports of overflows have diminished <u>considerably</u>."  DSMF ¶ 25 (citing *Rivera Dep. Tr.* at 68:26:9-25) (citation corrected) (PRASA's emphasis).  Plaintiffs deny this averment, submitting that PRASA's own engineer has admitted the overflows occur and are ongoing.  PRDSMF ¶ 25 (citing *Mot. for Leave to File Ex.*, Attach. 1, *Taking of the Dep. of Eng. José Martí-Carvajal* at 68-69 (ECF No. 160) (*Martí Dep. Tr.*).  After reviewing the record, the Court concludes the Plaintiffs' argument that overflows are ongoing does not contradict PRASA's assertion of fewer reported overflows since the improvements to the Treasure Valley Pump Station and thus deems PRASA's statement admitted in full.  Further, PRASA submits additional evidence, the declaration of Jaime A. Géliga, to support its statement.  As discussed in the previous footnote, the District of Puerto Rico Local Rules provide that a reply statement of material fact "shall be limited to any additional fact submitted by the opposing party."

In addition, the "Fund Allocation Agreement for the 'Design, Construction and Force (sic) Main Line Expansion of Ciudad Primavera Sanitary Sewer Pump Station'" project provides funding for a sewer connection to relieve affected areas.  PSAMF ¶ 28; DRPSAMF ¶ 28.  The Cidra municipal government had contracted with PRASA to provide funding for the project; however, the execution costs far exceed the approximately $2.5 million dollars committed by the Cidra municipality.[29]  PSAMF ¶ 28; DRPSAMF ¶ 28.  PRASA is undertaking efforts to ascertain if the additional funding will be provided totally or partially by Cidra's municipal government, or whether additional funding sources have been already identified.  PSAMF ¶ 28; DRPSAMF ¶ 28.  When visiting the municipality of Cidra's offices, Mr. Reyes found out the municipality had ordered the funding contract to be cancelled.  PSAMF ¶ 28; DRPSAMF ¶ 28.

### 8.    Condition of Lake Cidra

Spot check samples were taken to validate biological contamination with coliforms and fecal matter from SSOs at Lake Cidra and the nearby creek, which were analyzed by the environmental laboratory EQ Lab and tested positive for high presence of Total Coliforms above water quality standards for designated Lake Cidra

---

D.P.R. LOC. R. 56(d).  PRASA's new evidence supports its own proffered fact, rather than responding to Plaintiffs' additional facts.  The Court will therefore not consider it as a separate basis for admitting DSMF ¶ 25.

[29]    PRASA admits Plaintiffs' proposed statement of fact but adds the qualification that "the contract with the Municipality was to provide <u>funding</u> for the project. The cancellation only means that PRASA will have to obtain the funding for said project from a different source."  DRPSAMF ¶ 28 (emphasis added by PRASA).  Plaintiffs do not dispute this addition in their sur-reply; thus, the Court deems the statement of fact, including PRASA's qualification, admitted in full.

uses. PSAMF ¶ 31; DRPSAMF ¶ 31. The sampling process was virtually observed by Plaintiffs' environmental engineer, Geannette M. Siberón, to evaluate its compliance with quality controls, contamination prevention and sample preservation.[30] PSAMF ¶ 31; DRPSAMF ¶ 31. The tests reflected an exceedance of the Total Coliforms parameter pursuant to the applicable Water Quality Standards Regulations, as administered by the Puerto Rico Department of Natural and Environmental Resources, which demonstrates that the unauthorized overflows are affecting the water quality of Lake Cidra.[31] PSAMF ¶ 32; DRPSAMF ¶ 32. Plaintiffs submitted the results of the test to EPA during the public comment stage of the modification of PRASA's 2015 Consent Decree, such that the claim was heard, evaluated, answered, and incorporated in the record of PRASA's 2015 Consent Decree modification case. DRPSAMF ¶ 32.

Ms. Siberón concluded the evidence substantiates a critical situation wherein PRASA, after the completion of new sewer lines in the Cidra area, has inadvertently aggravated a severe environmental crisis; the SSOs near Plaintiffs' property inflict not only adverse consequences on the environment and public, they affect the water

---

[30]    PRASA admits this fact, adding only that "the results of the test were submitted by the Plaintiff[s] to the EPA during the public comment stage of the modification of PRASA's 2015 [Consent Decree]. Plaintiffs' claim was heard, evaluated, answered and incorporated in the record of the PRASA's 2015 [Consent Decree] modification case." DRPSAMF ¶ 31. Plaintiffs do not dispute this qualification; thus, the Court deems the fact admitted in full, along with PRASA's addition.

[31]    As in the prior footnote, PRASA admits this fact with the qualification that the results of the study were shared with EPA and incorporated into the modification of the 2015 Consent Decree, DRPSAMF ¶ 32; Plaintiffs do not dispute the addition. The Court thus deems the fact admitted in full, including PRASA's addition.

quality of the lake for the designated uses, and due to their location, directly impact Plaintiffs' well-being and interests.[32]  PSAMF ¶ 33.

Mr. Reyes has observed people fishing in Lake Cidra adjacent to his property.[33] DSMF ¶ 15; PRDSMF ¶ 15.

---

[32]    In support, Plaintiffs cite Ms. Siberón's expert report.  PSAMF ¶ 33 *(citing Pls.' Summ. J. Opp'n,* Attach. 5, *Taking of the Dep. of Ms. Geannette M. Siberón-Gonzalez, Ex. 3, Supp. Answers to Modified Reqs. for Prod. of Docs.* at 18 (*Siberón Dep. Tr. and Exs.*)) (citation corrected).  PRASA objects to this statement of facts, alleging "it is based on 'conclusory allegations, improbable inferences, and unsupported speculation'" and citing First Circuit caselaw holding "[w]here an expert present 'nothing but conclusions — no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected,' such testimony will be insufficient to defeat a motion for summary judgment.").  DRPSAMF ¶ 33 (quoting *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 92 (1st Cir.1993)).  Plaintiffs sur-reply emphasizes Ms. Siberón's "ample experience" as an environmental engineer and asserts the conclusions were "derived by the examination of PRASA's documents" and "are based on evidence and logical inferences."  *Pls.' Summ. J. Sur-reply* at 15-19.

PRASA offers no concrete examples of why Ms. Siberón's testimony is unreliable or why her conclusions are unsupported by the evidence.  The Court's review of the record shows Ms. Siberón provided a clear statement of her qualifications on the first page of her report: "Eng. Geannette M. Siberón, PE, BSChE, CS-Eng lic. 15233; Licensed professional Chemical-Environmental Engineer with 28 years of experience in capital projects, design, operation, maintenance of Water and Waste Water Systems, sampling and data analysis, permits, spills/overflows incidents investigations, development of corrective and preventive action plans, preventive maintenance programs, consent decree, and compliance with Clean Water Act, PRASA Regulations, Department of Natural Resources & Environment Regulations and Water Quality Standards. Member of the Interamerican Association of Sanitary and Environmental Engineering," and attached a copy of her professional engineer credential.  *Siberón Dep. Tr. and Exs.* at 215, 239.  Ms. Siberón continues to explain the documents she reviewed to reach her conclusions, which included, inter alia, the evidence provided in this case; lab analysis of water spot check samples; public notices of enforcement actions and Consent Decrees; three field inspections; interviews with Mr. Reyes, former PRASA employees, and other residents; and applicable law, regulations, and discharge permits.  *Id.* at 223-25.  She detailed the initial assessment and subsequent investigation undertaken to confirm the Plaintiffs' allegations, *id.*, explained the applicable law and requirements of PRASA's discharge permit, *id.* at 228, 232, described PRASA's response according to residents, *id.* at 227, and analyzed the results of the water quality sampling of Lake Cidra.  *Id.* at 229, 244-45.  She also considered potential causes of the SSOs and proposed remedial actions.  *Id.* at 233-34, 247.  Finally, she compared all this information against "PRASA's allegations that [the] problem is attended" to reach her conclusions that PRASA's actions have been inadequate, explaining the lacking evidence that PRASA has remedied the overflow issues or has been subjected to regulatory action relating to the same.  *Id.* at 236-38 (capitalization altered).  In light of the robust description of her methodology and the basis for her conclusions, the Court concludes Ms. Siberón's testimony, as cited by Plaintiffs in support of their statement of fact, is not "nothing but conclusions — no facts, no hint of an inferential process," *Hayes*, 8 F.3d 88, and deems the proposed fact admitted in full.

[33]    PRASA asserts: "Mr. Noel Reyes has observed people fishing in the Cidra Lake adjacent to his property, showing that the alleged PRASA violations have not curtailed the recreational use of the area because of a belief that it is contaminated. [] Also this shows that the water quality investigation

## B.    A Final Note on the Scope of the Record

Before considering the merits of the pending motions, the Court addresses a unique aspect of the record owed to the complicated procedural history of this case. After a complete summary judgment motion sequence, the Court at oral argument requested clarification and resolution of specific evidentiary issues, such as misnumbered exhibits and evidence not disclosed during discovery. PRASA leverages the Court's request for clarification as an opportunity to present original arguments and novel evidence in its motion in compliance. Specifically, PRASA continues its challenge to Plaintiffs' standing by citing newly presented evidence in support of its arguments that Plaintiffs' allegedly affected property has not depreciated in value and is not connected to the PRASA sewer system. *PRASA's Compliance Mot.* at 9-12. PRASA also submits new evidence to support its claim that PRASA had invoked its contractual right to Force Majeure for the period relevant to this case. *Id.* at 13-16.

---

performed by PRASA's contractor conclusion is correct, when it assessed that the water of the lake meets the criteria for its use as a source of drinking water supply." DSMF ¶ 15 (citing *Reyes Dep. Tr.* at 30:14-25; *EPA's E-mail to Pls.* ¶ 4). Plaintiffs dispute this statement, submitting that Mr. Reyes testified he only seldom sees people fishing in the lake, that PRASA's inference about recreational use of the lake is an inference impermissible at the summary judgment stage, and that the referenced study was not included on the record. *Pls.' Summ. J. Reply* at 10-11.

In reviewing the record, the Court concludes that PRASA correctly characterizes Mr. Reyes's unqualified statements as to observing fishing in the lake. *See PRASA's Reyes Translated Dep. Tr.* at 30 ("A. The people who are going fishing pass through. Usually they leave their car around in a corner, and they walk over and go fishing. Q. Okay. How often do you go. . . do you say that happens, that people go there to fish? A. Well, I, while I was working on the house, right, I was there for a long time, well, I could see people go around there, park their cars, bring in their bucket and their fishing rod and would sit around there. And if you enter through Cidra's main bridge, you can also see people around there, fishing.") However, the Court concludes Plaintiffs are also correct that these statements do not support PRASA's conclusions regarding recreational use being curtailed by an impression of contamination, nor its inference that Lake Cidra's water must be potable. *See Mancini*, 909 F.3d at 38 (quoting *Ahern*, 629 F.3d at 54) (at summary judgment, a court should disregard "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation"). The Court thus deems admitted the supported statements regarding fishing but excludes PRASA's inferential assertions.

However, the Court's request for the parties to remedy particular deficiencies in the summary judgment record was not an invitation to supplement the summary judgment motions with entirely new evidence and lines of argument. Courts within this Circuit have consistently denied attempts to inject new claims and evidence after the close of the summary judgment record. *See, e.g.*, *Cavanagh v. Taranto*, 95 F. Supp. 3d 220, 227 n.7 (D. Mass. 2015) ("The belated submittal of additional materials by plaintiff's counsel after the record on which summary judgment was sought and had been closed and contested in writing is of a piece with his litigation practice — and apparent strategy — of seeking to forestall timely and orderly resolution of the dispositive motion record by untimely submission of additional materials following the conclusion of briefing. I decline to consider such vagrant submissions"); *cf. Gillis v. SPX Corp. Individual Account Ret. Plan*, 511 F.3d 58, 63 & n.5 (1st Cir. 2007) (noting "serious concerns" where a plaintiff had sought and was granted leave to file a memorandum after the close of the summary judgment record but had instead submitted novel arguments).

Here, PRASA submitted new evidence outside of the standardized summary judgment process, which is specifically designed to permit litigants to clearly accept or dispute assertions of fact and cited evidence such that the Court may rule on a clean record. Submitting novel evidence after this stage, unrelated to the Court's requested clarifications and identified errors, circumvents this rigorous and structured process. Thus, for the purposes of the pending motion for summary judgment, the Court relies on the record of material facts as articulated by the parties'

statements of fact, with the narrow exception of permitting clarifications to exhibit numbers and translations as specifically requested by the Court.

## IV.    STANDING CHALLENGE VIA MOTION IN LIMINE

### A.    The Parties' Positions

#### 1.    PRASA's Motion in Limine

PRASA argues Plaintiffs bear the burden of proving their standing to bring the present action pursuant to *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1991), and challenges Plaintiffs' ability to demonstrate each element of standing in turn. *PRASA's Mot. in Lim.* at 2.

First, PRASA avers an injury in fact must be particularized and concrete, and submits Plaintiffs fail to satisfy these requirements, arguing "[f]or an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 3 (quoting *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016)) (citation corrected). Further, PRASA reports, "a 'concrete' injury must be 'de facto'; that is, it must exist." *Id.* (citing *De Facto*, BLACK'S LAW DICTIONARY (9th ed. 2009)) (citation corrected). Quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000), PRASA submits "[t]his requirement  applies with special force when a plaintiff files suit to require an executive agency to 'follow the law,'" reporting "the citizen must prove that he 'has sustained or is immediately in danger of sustaining a direct injury as a result of that [challenged] action and it is not sufficient that he has merely a general interest common to all members of the public.'" *Id.* at 4 (quoting *Laidlaw*, 528 U.S. at 183-84) (emphasis omitted).  Applying this standard to the case at bar, PRASA characterizes Plaintiffs' alleged injury, diminished property

value, as "a typical indirect injury insufficient to meet the constitutional requirement for standing," contrasting the economic injury alleged here with "residents who may experience direct health risks or diminished quality of life." *Id.* (capitalization corrected).

Turning to the element of causation, PRASA points out that "[p]roperty values are influenced by numerous subjective and speculative factors, such as economic downturns, interest rate fluctuations, and broader market conditions." *Id.* Due to the difficulty of isolating the impact of pollution and Plaintiffs' status as non-resident property owners, PRASA argues that Plaintiffs "lack the direct and personal connection to the alleged pollution necessary to establish causation," specifically that the alleged injury is fairly traceable to PRASA. *Id.*

Third and finally, PRASA insists injunctive relief and civil penalties pursuant to the CWA fail to redress Plaintiffs' alleged injury of diminished property value, as either of these remedies "do not guarantee, nor even promise, a restoration of property value to its pre-pollution status." *Id.* at 5. Further, PRASA argues, the Consent Decree between PRASA and EPA comprehensively addresses the alleged violations, "including the imposition of stipulated penalties and the implementation of corrective measures." *Id.* PRASA maintains that allowing Plaintiffs to pursue an independent action based on the same violations would "undermine the authority of the EPA," "create unnecessary duplication of efforts," "lead to inconsistent and potentially conflicting results," and "awarding civil penalties to the Plaintiff[s] would constitute a windfall and would serve no legitimate public purpose." *Id.* at 6.

31

PRASA concludes by asking the Court to dismiss Plaintiffs' complaint for lack of standing.  *Id.*

2.    **The Plaintiffs' Opposition**

Plaintiffs aver that PRASA does not dispute that they are the owners of the real property "located at the end of the Villa Guanime Street, in the Bayamón ward (barrio) in Cidra," and that the manholes from which sewage allegedly overflowed are "mere inches away from the shore of Lake Cidra, and the constant unauthorized overflows reach copiously the lake, affecting the water quality of the lake." *Pls.' Mot. in Lim. Opp'n* at 5.  They then recount their history of involvement with the Villa Guanime Street property, stating that they purchased the Cidra property in 2014 and, when the former residence deteriorated, "invested approximately $100,000.00 to repair it, and to divide it in[to] three dwellings." *Id.*  When Mr. Reyes began seeing sewage overflows in 2015, he avers he reported them to EPA beginning in November 2015; EPA subsequently visited the property with PRASA personnel and discussed the sewage discharges with Mr. Reyes. *Id.*  After more sewage overflows, Mr. Reyes again raised the issue to EPA in April 2018 and continued to inform "Héctor Ortiz of the EPA by email, on many occasions" of subsequent discharges. *Id.* at 6.  Mr. Reyes further reports that he spent significant time at the property from 2015 to 2018 conducting renovations, personally witnessed several sewage discharge events during that time, and that both he and his tenant residing on the property informed EPA, PRASA, and municipal authorities. *Id.*  These discharge events continued until and after he notified EPA of his intent to bring a CWA citizen suit on August 19, 2019. *Id.*

Plaintiffs aver the sewage discharges affected Mr. Reyes financially, as "he has not recovered his investment in the property" and "the property suffered loss of value," affecting him personally when he was "diagnosed with depression." *Id.* at 7. Plaintiffs maintain that the CWA's broad definition of "citizen" entitled to bring a citizen suit encompasses "property owners who are directly affected by environmental issues such as contamination, as long as they meet the standing requirements." *Id.* (citing *Laidlaw*, 528 U.S. at 181). They urge the Court that standing in environmental cases "can be established if the plaintiff alleges that *pollution has caused harm to their property or personal interests." Id.* at 8-9 (citing *Little Hocking Water Ass'n v. E.I. du Pont de Nemours & Co.*, 91 F. Supp. 3d 940 (S.D. Ohio, 2015) (finding the plaintiff had standing to sue based on contamination on their property traceable to the defendant)) (Plaintiffs' emphasis). Plaintiffs contend they satisfy the element of injury in fact because they owned, and continue to own, the property next to the manholes which allegedly overflowed and next to Lake Cidra, which is allegedly being affected by the sewage discharges. *Id.* at 9.

Turning to causation, Plaintiffs submit PRASA's failure to control the unauthorized sewage discharges demonstrates a fairly traceable connection between their injury and the Defendant's conduct. *Id.* Plaintiffs further insist their claim seeks to hold PRASA to the penalties contemplated by the CWA and the Consent Decree, which they submit satisfies the redressability element of standing. *Id.* at 10.

Finally, Plaintiffs respond to PRASA's allegation that their failure to reside at the property undermines their standing to bring this case, arguing that Supreme

Court caselaw does not include a continuous physical presence requirement, but rather a showing "that the government action has caused or likely will cause injury in fact to the plaintiff," a standard they argue they satisfy here. *Id.* (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024)) (citation corrected). Similarly, Plaintiffs submit that the requirement of a live controversy throughout the litigation does not require them to remain in the affected area, but merely that the "injury must be ongoing or there must be a realistic danger of sustaining a direct injury because of the challenged action." *Id.* (citing *Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979)). Plaintiffs conclude that they remain owners of the property adjacent to the affected Lake Cidra, such that "the potential for more overflows affects their property." *Id* at 11.

### 3.    PRASA's Motion in Compliance and Opposition to Plaintiffs' Motion to Amend

PRASA supplemented its standing challenge in submissions following oral argument. In its motion in compliance with the Court's request for clarification at oral argument, in relevant part, PRASA first reiterates its position that "proximity to an alleged discharge is not enough to establish standing," insisting that Plaintiffs have failed to support their claimed injury of property devaluation. *PRASA's Compliance Mot.* at 9. PRASA contends official Property Registry records indicate Mr. Reyes purchased the Cidra property for $97,000 in 2014 and secured a buyer willing to pay $168,000 for the same in 2018. *Id.* at 9-10 (citing *id.*, Attach. 5, *Prop. Reg.* (*2014 Sale Record*); *id.*, Attach. 6, *Appraisal Rep. – Special Assignment* (*2018*

34

*Appraisal Rep.*)) (citations corrected).[34]    PRASA submits this increase in property value corresponds with the period in which Plaintiffs claim economic harm, and thus contradicts their claim against PRASA.  *Id.* at 10.

PRASA adds that the 2018 appraisal remarks "[t]he property was bought by the current owner as of 6/16/2014, however the amount was not disclosed in the CRIM (Property Tax) data website."  *Id.* at 10 n.13 (citing *2018 Appraisal Rep.* at 2).  PRASA avers "[t]his omission is significant because any proper valuation analysis needs to consider the property's historical price trends," and that "[a] claim of economic injury based on an appraisal that lacks full market context cannot serve as a sufficient basis to sustain the injury in fact prong of the standing analysis."  *Id.* at 10-11 (emphasis omitted).

PRASA next turns to the causation element of Plaintiffs' standing, presenting evidence that the Cidra property "does not have a sewer service registered with PRASA," *id.* at 11 (citing *id.*, Attach. 8, *Water and Sewer Servs. Certification* (*Pls.' Water Bill*)) (citation corrected),[35] and speculating that "[i]f Reyes is using an alternative, unregulated, or unpermitted method of sewage disposal, then he may be very well contributing to the very pollution, foul odo[]rs and other health threats he blames on PRASA."  *Id.* at 12 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418

---

[34]    PRASA's motion in compliance cites Exhibits 3 and 4, respectively, as the sources for these dollar amounts.  On the Court's review, these citations are incorrect.  The 2014 purchase and sale record is Attachment 5 to its motion in compliance, and the 2018 appraisal is Attachment 6.  For the purpose of accuracy, the Court corrects the numeration of PRASA's citations.

[35]    Similarly to the prior footnote, PRASA cites Exhibits 6 certification of water and sanitary sewer services for the Cidra property' however, this document is actually attached as Attachment 8 to PRASA's motion in compliance.

(2013)).  PRASA contends it was Plaintiffs' burden to disclose such information, and their failure to do so prejudiced PRASA's ability to assert relevant defenses.  *Id.*

Third, PRASA again disputes the redressability element of Plaintiffs' standing, contending that their requested relief would not redress the alleged harms because the property value has increased significantly over time and because, if other sources contribute to Lake Cidra's condition, then a court order "against PRASA would not necessarily restore the lake or improve Reyes'[s] property value."  *Id.*

Turning to the applicable standard of review, PRASA avers that the Court is entitled to independently determine whether PRASA's and EPA's actions in this case satisfy the diligent prosecution bar, rather than deferring to an agency's interpretation, pursuant to *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  *Id.* at 12.  PRASA continues by reasserting its arguments from prior filings that the diligent prosecution bar applies to Plaintiffs' CWA citizen suit because there was a prior federal consent decree involving compliance obligations, stipulated penalties, and ongoing oversight.  *Id.* at 13-14.  Citing portions of the 2019 and 2020 CERs not previously in the record, PRASA contends that it was "protected [] from penalties relating to sanitary sewage overflows" from March 1, 2018 until August 31, 2019, *id.* at 15 (citing *id.*, Attach. 9, *Fiscal Year 2019 [CER] for [PRASA]*) (citation corrected), and from March 1, 2019 to August 31, 2020.  *Id.* (citing *id.*, Attach.  10, *Fiscal Year 2020 [CER] for [PRASA]*) (citation corrected).[36]  PRASA also argues that

---

[36]    As in Footnote 34, PRASA misnumbers its cited attachments as Exhibits 8 and 9, respectively. On ECF, the 2019 CER is Attachment 9 and the 2020 CER is Attachment 10 to PRASA's motion in compliance.

Mr. Reyes had previously submitted his concerns, which were acknowledged on the record in *United States v. PRASA*, Case No. 15-02283, as part of an approved amendment to the 2015 Consent Decree. *Id.* at 16. This evidence, PRASA says, demonstrates the 2015 Consent Decree was being enforced in response to Plaintiffs' claims. *Id.*

In its opposition to Plaintiffs' motion to amend the complaint in *Cebollero-Bertrán v. PRASA*, No. 3:19-cv-01412-JAW, PRASA includes arguments relating to the *Reyes* case, taking a different tack by arguing that, while Plaintiffs' counsel filed a motion only to amend the *Cebollero* complaint, the amended complaint "not only omits Reyes'[s] name and previous case number from the complaint caption but also entirely excludes Reyes from the amended pleading—effectively abandoning their claims." *PRASA's Mot. to Amend Opp'n* at 2. PRASA submits this omission "creates unnecessary uncertainty as to whether Reyes remains a party to this case" and contends that "[b]y failing to include Reyes in the amended complaint, Plaintiffs have voluntarily discarded those claims, warranting their dismissal with prejudice." *Id.* PRASA asserts "Reyes never sought to amend his complaint, yet his claims have now vanished from the record without explanation, leaving PRASA to speculate whether he remains a party and whether his abandoned claims could later resurface in an attempt to prolong the case." *Id.* at 17-18. "This procedural ambiguity," the Defendant says, "places PRASA at an unfair position, forcing it to defend against an incoherent set of claims that defy the very purpose of consolidation." *Id.* at 18.

37

Finally, PRASA reiterates its positions that the Plaintiffs have not been injured both because the value of the Cidra property increased and because they never inhabited the Cidra property, such that the case should be dismissed for lack of standing.  *Id.* at 20-21.

### 4.    Plaintiffs' Response to PRASA's Motion in Compliance

Plaintiffs' response to PRASA's motion in compliance, in relevant part, first argues that the CWA citizen suit provision is not limited to residents, but rather permits lawsuits by "property owners who are directly affected by environmental issues such as contamination" who are able to establish their standing to bring suit.[37] *Pls.' Compliance Resp.* at 2.    Quoting the Supreme Court, Plaintiff avers "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Id.* (quoting *Laidlaw*, 528 U.S. at 181 (in turn quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)) (citation corrected).  An injury is concrete even if not physical or economic, Plaintiffs continue, pointing out that "proximity to environmental harm, economic loss, and personal injury establish a direct stake in the outcome."  *Id.* at 3 (collecting federal cases outside the First Circuit).

---

[37]    Plaintiffs acknowledge PRASA's position that their failure to request the Court's permission to amend their complaint should result in a judicial conclusion that their claim has been abandoned and should be dismissed.  *Pls.' Compliance Resp.* at 1.  They indicate their intent to respond in a footnote but have either decided against or neglected to do so, as the contemplated motion for leave to respond has not been filed in the approximately four months between their submission and the issuance of this order.  *See id.* n.1 (stating, in full: "Plaintiffs will file a Motion for Leave to respond to PRASA's bald and baseless assertions in Dkt. No. 197.  However, all Plaintiffs state that their claims remain and have not been considered as abandoned, as[] PRASA suggests in its Motion")

Further, Plaintiffs say, "[s]tanding does not require continuous residence"; rather, "[c]ourts have recognized economic harm and property devaluation caused by pollution as ongoing injuries that satisfy this requirement." *Id.* at 4 (citing *Babbitt*, 442 U.S. 289). Here, Plaintiffs argue they have demonstrated ongoing contamination and a historical pattern of noncompliance, satisfying their burden of proving a likelihood of continued harm. *Id.* Plaintiffs support their position by collecting federal cases in which courts concluded plaintiffs had successfully established their standing to bring suit. *Id.* at 4-5 (citing, e.g., *Little Hocking Water Ass'n*, 91 F. Supp. 3d 940; *Ohio Valley Env't Coal. v. Foal Coal Co., LLC*, 274 F. Supp. 3d 378 (S.D. W.Va., 2017); *S. Utah Wilderness All. v. United States DOI*, No. 2:23-CV-00804-TC-DBP, 2025 U.S. Dist. LEXIS 20644 (D. Utah Feb. 4, 2025)).

Turning to the causation prong of the standing inquiry, Plaintiffs aver that the standard requires only "a reasonable inference that the defendant's conduct contributed to the harm." *Id.* at 6 (citing *Massachusetts v. EPA*, 549 U.S. 497 (2007)). Here, Plaintiffs assert they personally witnessed the sewage overflows and reported them to the EPA and PRASA. *Id.* Further, they reassert their argument that the proximity of the overflowing manholes, located "mere inches" from Lake Cidra, provides a reasonable basis to infer causation, and PRASA has presented no alternative explanations that would break the causal chain. *Id.* (citing *Ohio Valley Env't Coal*, 120 F.Supp. 3d 509).

Third, Plaintiffs again argue their requested relief would redress their alleged harm, first directing the Court to *Lujan*'s holding that a property's value need not be

restored completely, but only partially, to be redressable. *Id.* at 7. Here, Plaintiffs submit, an order from the Court compelling compliance with the CWA would reduce ongoing harm by preventing further environmental damage and corresponding property devaluation. *Id.*

Responding to PRASA's assertions that the Cidra property's value has not been harmed and that Plaintiffs' appraiser erred in not considering the property's prior purchase price history, Plaintiffs argue these challenges are irrelevant to determining their standing to bring a CWA citizen suit. *Id.* at 11-12. Plaintiffs counter that PRASA "has not produced – not a single shred – of evidence suggesting another cause entirely by the acts of any other third party" and observe that PRASA has conceded "that the sewer manholes discharging raw sewage to Lake Cidra are under its control" without explaining "why these manholes continue discharging pollutants into the Lake Cidra, unabated and in clear violation of the Consent Decree." *Id.* Plaintiffs also submit a declaration from Mr. Reyes stating that "all raw sewage from his property is disposed of through PRASA's own sanitary system," though PRASA does not appear to charge him for sewer service. *Id.* at 13 (citing *id.*, Attach. 2, *Decl. in Support of Pls.' Reply to PRASA's Mot. in Compliance with Order* (*Reyes Decl.*)).

Finally, Plaintiffs reassert their argument that the diligent prosecution bar does not apply to their case because PRASA has presented no evidence "that it was in compliance with the 2016 Consent Decree by the time the complaints were filed." *Id.* at 14.

### B.    Legal Standard for Standing Challenge at Summary Judgment Stage

Article III of the United States Constitution restricts federal courts to hearing only "Cases" or "Controversies."  U.S. CONST. art. III, § 2.  To establish that there is a justiciable case or controversy, a plaintiff must have standing to obtain the relief sought. *See Lujan*, 504 U.S. at 560.  "Standing is a threshold issue in every federal case." *Me. Springs, LLC*, 2015 U.S. Dist. LEXIS 33259, at *12 (citing *Pagan*, 448 F.3d at 26) (stating that "[a] federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims").  "To satisfy the 'irreducible constitutional minimum of standing,' Plaintiff must show (1) that they have suffered an injury in fact, (2) that the injury is fairly traceable to the [Defendant]'s allegedly unlawful actions, and (3) that 'it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 26 (1st Cir. 2007) (quoting *Lujan*, 504 U.S. at 560-61).

According to the Supreme Court, an "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations, footnote, and quotation marks omitted).  "The party invoking federal jurisdiction bears the burden of establishing these elements." *Me. Springs, LLC*, 2015 U.S. Dist. LEXIS 33259, at *13 (quoting *Lujan*, 504 U.S. at 561).

In addition to establishing their constitutional standing to bring suit, a plaintiff must satisfy the distinct requirement of prudential standing. This Court has explained the doctrine of prudential standing as:

> The general prohibition on a litigant's raising another person's legal rights, the rule barring the adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone interest protected by the law invoked.

*P.R. Campers' Ass'n v. P.R. Aqueduct & Sewer Auth.*, 219 F. Supp. 2d 201, 209, 213 (D.P.R. 2002) (quoting *Devlin v. Scardelletti*, 536 U.S. 1, 7 (2002)).

As the Court noted at oral argument, PRASA raises its standing arguments within a nominal motion in limine and yet asks the Court to dismiss the complaint. *See PRASA's Mot. in Lim.* at 2-6. A motion in limine is an atypical vehicle for such a request; as the Supreme Court has explained, "standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings." *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979). As such, courts often conceive standing challenges as motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See, e.g., Wiener v. MIB Grp., Inc.,* 86 F.4th 76, 82 n.8 (1st Cir. 2023) (recharacterizing the defendant's standing challenge pursuant to Rule 12(b)(6) as instead properly brought under Rule 12(b)(1)); *Mun. of San Sebastian v. Puerto Rico*, 89 F. Supp. 3d 266, 273 (D.P.R. 2015) ("A motion to dismiss for lack of standing is properly understood as a challenge to the reviewing court's subject-matter jurisdiction"); *Me. Ass'n of Interdependent Neighborhoods v. Comm'r, Me. Dep't of Hum. Servs.*, 747 F. Supp. 88, 91 (D. Me. 1990) ("The [defendant]'s motion to dismiss for lack of standing is an issue of subject matter

jurisdiction . . . and thus it is properly made pursuant to Fed. R. Civ. P. 12(b)(1)")
(internal citations omitted).

Here, though, PRASA challenges standing via a motion in limine filed after its motion for summary judgment. *Compare PRASA's Second Summ. J. Mot.* (filed May 31, 2024) *with PRASA's Mot. in Lim.* (filed August 2, 2024). The First Circuit has addressed a challenge to standing at this later stage, explaining that "[t]o establish the[] elements of standing at the summary judgment stage of a proceeding, a plaintiff cannot rest on mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Libertad v. Welch*, 53 F.3d 428, 436 (1st Cir. 1995) (citing *Lujan*, 504 U.S. at 561); *accord Suárez-Torres v. Panaderia y Resposteria España, Inc.*, 988 F.3d 542, 550 (1st Cir. 2021)).

### C.    Discussion

PRASA challenges Plaintiffs' constitutional standing on each of the requisite elements: injury in fact, causation, and redressability. Following the parties' lead, the Court considers Plaintiffs' standing to bring its claim by addressing each element in turn. First, however, the Court addresses PRASA's threshold argument of abandonment by virtue of Plaintiffs' failure to move to amend their complaint.

### 1.    Abandonment of Claims

PRASA argues that by failing to move to amend their complaint, as was done in the consolidated case *Cebollero-Bertrán v. PRASA*, No. 3:19-cv-01412-JAW, Plaintiffs in this case have functionally abandoned their claims. *See PRASA's Mot. in Compliance* at 9; *PRASA's Mot. to Amend Opp'n* at 2, 20-21. This argument

mischaracterizes the Court's discussion at oral argument and, further, fundamentally misunderstands the effects of the Court's consolidation order.

First, as PRASA acknowledges, at oral argument the Court "addressed the pleadings of each Plaintiff separately, analyzing the specific deficiencies in each individual complaint." *PRASA's Mot. to Amend Opp'n* at 2. However, PRASA continues to say "the Honorable Judge instructed Plaintiffs' counsel to file an amended complaint to correct those deficiencies." *Id.* This recollection of the Court's directive as applying to the *Reyes* Plaintiffs is only partially accurate. In fact, while true that the Court identified multiple deficiencies in both cases and accorded each party an opportunity to file briefing responsive to its concerns, the Court only discussed pleading defects in the complaint in *Cebollero-Bertrán v. PRASA*, No. 3:19-cv-01412-JAW. Specifically, the Court asked Plaintiffs' counsel, who is the same in both cases, to clarify whether the plaintiff in *Cebollero-Bertrán v. PRASA*, No. 3:19-cv-01412-JAW intended to assert the injury of property value diminution, contrasting the language of the complaint in that case with the language of the complaint in *Reyes-Muñoz v. PRASA*, No. 3:19-cv-02131-JAW in which property diminution is plainly alleged. The Court did not identify any deficiencies with the complaint in *Reyes-Muñoz v. PRASA*, No. 3:19-cv-02131-JAW, nor did Plaintiffs' counsel discuss an intention to move to amend in this case.

Second, as the Court specifically explained in its order consolidating the two cases, "[e]ven when consolidated, . . . each case's individuality and distinctness will remain." *Consolidation Order* at 14 (quoting *Norton Lilly Int'l*, 2019 U.S. Dist. LEXIS

240524, at *4); *see also id.*, citing *Hall v. Hall*, 584 U.S. 59, 70 (2018) ("consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another") (quoting *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-97 (1933)).  The Court made sure to emphasize that the distinct identities of the two cases would be preserved in part because of PRASA's own articulated concerns that consolidation would result in the two cases being adjudicated as one.  *See Def. PRASA's Resp. to Pls.' Request for Consolidation* at 2 (ECF No. 208).  The Court is thus nonplussed by PRASA's present assertion that the motion to amend the complaint in *Cebollero-Bertrán v. PRASA*, No. 3:19-cv-01412-JAW must incorporate the separate and distinct claims of the *Reyes* Plaintiffs or else forfeit such claims.

At bottom, despite consolidation for the sake of judicial economy, the two cases remain distinct such that the plaintiff's request to amend her complaint in *Cebollero-Bertrán v. PRASA*, No. 3:19-cv-01412-JAW has no effect on the vitality of the Plaintiffs' complaint in *Reyes-Muñoz v. PRASA*, No. 3:19-cv-02131-JAW.  The Court disagrees with PRASA's claim that there is "uncertainty as to whether Reyes remains a party to this case," *PRASA's Mot. to Amend Opp'n* at 2; it is obvious to the Court that the Plaintiffs in *Reyes-Muñoz v. PRASA*, No. 3:19-cv-02131-JAW have proceeded on their original complaint.

## 2.    Standing

PRASA's arguments implicate both the doctrines of prudential and constitutional standing; the Court thus addresses each in turn.

### a.    Prudential Standing

PRASA characterizes diminished property value as an "indirect injury" and submits that such an injury fails to provide an adequate predicate for a CWA citizen suit. *PRASA's Mot. in Lim.* at 4. Plaintiffs disagree, insisting that the CWA's definition of "citizen" encompasses their alleged economic harm. *Pls.' Mot. in Lim. Opp'n* at 7-9. This dispute implicates the doctrine of prudential standing by placing at issue whether claims of property value diminution fall within the zone of interests protected by the CWA.

The Court concludes Plaintiffs have the better side of this argument. First, Plaintiffs correctly characterize the statutory definition of citizens entitled to bring suit, which provides "[f]or the purposes of this section the term 'citizen' means a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). The plain language of the statute does not impose the restrictions proffered by PRASA that a citizen must be a resident and suffer "direct health risks or diminished quality of life." *PRASA's Mot. in Lim.* at 4.

Second, the Supreme Court contemplated the scope of the CWA citizen suit provision in *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1 (1981), explaining that the statute's broad definition of citizen "necessarily includes both plaintiffs seeking to enforce these statutes as private attorneys general, whose injuries are 'noneconomic' and probably noncompensable, *and persons like respondents who assert that they have suffered tangible economic injuries because of statutory violations*." *Id.* at 16-17 (emphasis supplied). Here,

Plaintiffs allege tangible economic injury by virtue of property value diminution resulting from PRASA's unauthorized SSOs.

Based on the plain language of the statute and the Supreme Court's directive, the Court thus concludes that Plaintiffs' alleged economic harm falls well within "the zone interest protected by the law invoked." *P.R. Campers' Ass'n*, 219 F. Supp. 2d at 213 (quoting *Devlin*, 536 U.S. at 7).

### b.   Constitutional Standing

#### i.   Injury in Fact

Turning to the doctrine of constitutional standing, the Court begins by determining whether Plaintiffs have demonstrated, at the summary judgment stage, an injury in fact by virtue of "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

As explained in the prior section, Plaintiffs' asserted injury derives from their allegation that PRASA's unauthorized SSOs reduced the value of their real property. Ruling on a CWA citizen suit, the *Laidlaw* Court held that a plaintiff had established her injury in fact based, in part, on the plaintiff's attestation in that case "that her home, which is near [the defendant]'s facility, had a lower value than similar homes located further from the facility, and that she believed the pollutant discharges accounted  for some of the discrepancy." *Laidlaw*, 528 U.S. at 182-83.  The *Laidlaw* Court thus concluded the plaintiff had standing based on the "reasonable concerns about the effects of those discharges [which] directly affected [the plaintiff]'s . . . economic interests." *Laidlaw*, 528 U.S. at 184.  In *Housatonic River Initiative v. EPA*,

47

75 F.4th 248 (1st Cir. 2023), the First Circuit similarly ruled, in the context of a citizen suit brought under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq., that "[a] demonstrable reduction in the market value of one's property is an injury in fact for standing purposes." *Id.* at 265 (quoting *Kathrein v. City of Evanston*, 636 F.3d 906, 915 (7th Cir. 2011)); *accord Maya v. Centex Corp.*, 658 F.3d 1060, 1070-71 (9th Cir. 2011) ("A current reduction in the economic value of one's home is a cognizable injury for constitutional standing purposes"). Supreme Court and First Circuit jurisprudence thus compels the conclusion that a claim of property value diminution adequately alleges a particularized loss for the purposes of standing.

Here, Plaintiffs allege that, as a consequence of the sewage discharges described in the complaint, they "have suffered an injury in fact, namely, loss of value of their property where the sewage spills occur," *Compl.* ¶ 17, and have presented evidence to support their contention. *See Pls.' Reyes Translated Dep. Tr.* at 15 ("Q. What you think you've suffered. A. Well, obviously, I haven't recouped the money I invested there. It's been nine years of this. And throughout those nine years, well, we think the house has decreased because of the situation. Its value was decreasing. Q. You understand? A. Well you must see the expert's report. He has the knowledge. Q. Which expert's report? A. From the expert appraiser"). In its motion in compliance, PRASA contests the evidence of property diminution, presenting a novel argument that the property increased in value over the relevant period and that

Plaintiffs' appraiser's report erred in failing to consider historic sales prices of the Cidra property. *PRASA's Compliance Mot.* at 9-10.

The Court is not persuaded by PRASA's argument for several reasons. First, the Court's request for clarification on particular issues was not an open invitation to supplement the record with novel arguments and evidence, and the Court is not at all clear that such late-breaking evidence, not previously included in the summary judgment record, should be considered. Even if such evidence is considered, however, the First Circuit has held that, to prove standing at the summary judgment stage, a plaintiff "must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Libertad*, 53 F.3d at 436 (citing *Lujan*, 504 U.S. at 561); *accord Suárez-Torres*, 988 F.3d at 550. Here, Mr. Reyes stated in his deposition that the Cidra property's appraised value diminished based on the sewage discharges. *Pls.' Reyes Translated Dep. Tr.* at 15. Further, as cited by PRASA itself, the 2018 appraisal report states "[t]he adverse situation creates foul odors, health, security, and marketability issues, *and value loss*." *2018 Appraisal Rep.* at 2 (emphasis supplied). PRASA is entitled to contest the reliability of this evidence at trial, but for the purposes of determining standing at the summary judgment stage, as directed by the First Circuit, such evidence "will be taken as true." *Libertad*, 53 F.3d at 436 (citing *Lujan*, 504 U.S. at 561).

At bottom, taking this evidence as true for the purposes of the present standing challenge, the Court concludes that the Plaintiffs' alleged injury of diminished property value satisfies the injury in fact element for standing.

ii.    **Causation**

Turning to the element of causation, PRASA argues numerous factors affect property values, such that Plaintiffs cannot establish that any diminution in property value occurred as a result of any alleged pollution by PRASA. *PRASA's Mot. in Lim.* at 4. Plaintiffs reject this argument, insisting that PRASA's failure to control the sewage overflows affected Lake Cidra and, in so doing, is fairly traceable to their injuries. *Pls.' Mot. in Lim. Opp'n* at 9.

Here, Plaintiffs' complaint alleges their "property is adjacent to the sewage spills and the lake and is immediately affected by the dumping of raw sewage into the land and the lake." *Compl.* ¶ 22. In support, Mr. Reyes further testified in his deposition that an expert appraiser's report indicates the diminution in value of the property over his nine-year ownership, despite the physical improvements made to the property. *Pls.' Reyes Translated Dep. Tr.*at 15-16.

The Court concludes Plaintiffs have pleaded sufficient facts for it to reasonably infer that their economic harm is fairly traceable to the contamination of Lake Cidra caused by the unauthorized pollution discharged by PRASA. Plaintiffs have presented evidence supporting their allegations of raw sewage overflowing from manholes next to their residential property and into a lake adjacent to the property. *See Pls.' Reyes Translated Dep. Tr.* at 12-13 (Q. What did you see? A. Well, a great deal of wastewater flowing out of the manholes. A great deal . . .."); *Siberón Dep. Tr. and Exs.* at 215-16 (describing location of sewage overflows and affected residential property), 224-25 ("The SSOs of reference are releasing untreated sewage laden with fecal contaminants into the manholes surrounding land, asphalt, creeks, and

50

ultimately, the impaired Cidra Lake"). It is undeniable that such effects would reduce the demand for a property and, as such, negatively affect its value.

Following oral argument, PRASA submitted additional arguments and evidence that the Cidra property does not have sewer service, speculating that Mr. Reyes may himself be the cause of any contamination in Lake Cidra. *See PRASA's Mot. in Compliance* at 11-12 ("This fact raises critical questions: How is sewage from Reyes'[s] Cidra Property disposed of? Why wasn't Reyes upfront with this information? If Reyes is using an alternative, unregulated, or unpermitted method of sewage disposal, then he may be very well contributing to the very pollution, foul odo[]rs and other health threats he blames on PRASA"). The Court is not persuaded. First, PRASA moved for summary judgment on a robust and well-developed record, yet includes this argument and evidence for the first time in response to the Court's request for clarification on separate and discrete issues. Second, as above, in a challenge to standing at the summary judgment stage, the Court takes as true all specific facts "set forth by affidavit or other evidence." *Libertad*, 53 F.3d at 436 (citing *Lujan*, 504 U.S. at 561); *accord Suárez-Torres*, 988 F.3d at 550. As explained, Plaintiffs have presented evidentiary support for their assertions that the sewage overflows contaminated Lake Cidra, which in turn devalued their property.

Third, even if PRASA's new evidence regarding sewer service were accepted, PRASA is certainly correct that the factors other than sewage may affect a property's value, but it another matter entirely to say that where raw sewage is being periodically released near a property, these other factors would be sufficient to deny

standing in a CWA case. Indeed, if the Court accepted PRASA's proposition that an "other factors" argument is sufficient to defeat standing, the Court struggles to see how any case proceeding on a theory of injury of diminished property value could survive the standing analysis since property values are necessarily multi-factorial. As previously discussed, federal courts have widely recognized diminution of property value as a cognizable legal injury fairly attributable to the source of the pollution, and have granted standing to bring such claims. *See, e.g.*, *Laidlaw*, 528 U.S. at 184; *Housatonic River Initiative*, 75 F.4th at 265.

For these reasons, the Court concludes that, at this stage, Plaintiffs have adequately pleaded a fairly traceable nexus between their alleged injuries and the conduct of the Defendant.

### iii.        Redressability

Finally, PRASA argues the requested relief would fail to redress Plaintiffs' alleged injuries because injunctive relief and civil penalties "would not guarantee, or even promise, a restoration of property value to its pre-pollution status," and further would duplicate or conflict with the terms of the Consent Decree. *PRASA's Mot. in Lim.* at 5-6. It asserts that "[t]he CWA is designed to protect the environment, not to serve as a mechanism for economic restitution." *Id.* Plaintiffs respond that their requested relief of imposing the penalties contemplated by the CWA and the Consent Decree would serve to mitigate their harm. *Pls.' Mot. in Lim. Opp'n* at 10.

The Court concludes that Plaintiffs' requested relief satisfies the element of redressability for two main reasons. First, as the Court previously wrote in this case, "while a consent decree represents a step in the right direction, it is not a 'cure-all.'"

*Omnibus Op. and Order* at 16 (quoting *Cebollero-Bertrán*, 4 F.4th at 74-75). Plaintiffs allege that EPA has neither penalized PRASA for the particular sewage discharges underlying their suit as violative of either the 2015 Consent Decree or the CWA directly, nor has EPA brought their own enforcement action following notice of the discharges. *Compl.* ¶¶ 8-14, 28-29; PSAMF ¶ 30. In *Laidlaw*, the Supreme Court recognized the remedial effect of imposing civil penalties for past violations, writing "Congress has found that civil penalties in [CWA] cases do more than promote immediate compliance by limiting the defendant's economic incentive to delay its attainment of permit limits; they also deter future violations." *Laidlaw*, 528 U.S. at 185. In their complaint, Plaintiffs allege "the violations of sewage discharges are ongoing," *Compl.* ¶ 36, and on summary judgment they present evidence the SSOs continued until at least 2024, PSAMF ¶ 26; DRPSAMF ¶ 26; thus, deterring future violations would address their alleged injury.

Second, PRASA submits that Plaintiffs have not demonstrated that their requested remedies would restore the property to its pre-pollution value. *PRASA's Mot. in Lim.* at 5. However, this argument mistakes the standard for redressability. The First Circuit has written that a plaintiff "need not demonstrate that its entire injury will be redressed by a favorable judgment, [but] it must show that the court can fashion a remedy that will at least lessen its injury." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 319 (1st Cir. 2024) (quoting *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 49 (1st Cir. 2020)). Plaintiffs have sufficiently alleged facts allowing the Court to conclude that the

sewage discharges have negatively affected the value of their property, such that the Court may reasonably infer that deterring future discharges may lessen this injury or, at the very least, prevent additional diminution.

Based on the foregoing, the Court concludes Plaintiffs satisfy the three elements of constitutional standing and declines to grant PRASA's requested dismissal on this basis. Having dismissed PRASA's standing challenge, the Court proceeds to consider the merits of PRASA's motion for summary judgment.

## V.  MOTION FOR SUMMARY JUDGMENT

### A.  The Parties' Positions

#### 1.  PRASA's Motion for Summary Judgment

PRASA submits it is entitled to judgment as a matter of law pursuant to 33 U.S.C. § 1365(b)(1), which bars CWA citizen suits in the event of diligent prosecution through a civil or criminal action by EPA or a state agency in a United States court. *PRASA's Summ. J. Mot.* at 11 (citing 33 U.S.C. § 1365(b)(1)(B)). Similarly, PRASA says that 33 USC § 1319(g)(6), which authorizes EPA to assess administrative penalties for violations of the CWA, prevents CWA citizen suits from seeking imposition of civil penalties if EPA "has commenced and is diligently prosecuting an action" pursuant to the CWA.[38]  *Id.* at 11-12 (citing 33 U.S.C. § 1319(g)(6)(A)(i)).

---

[38]    In a footnote, PRASA again raises doubts regarding Plaintiffs' standing to bring its complaint based on damages suffered by their tenant. *See PRASA's Summ J. Mot.* at 13. Plaintiffs thus address the issue of standing in their opposition. *See Pls.' Summ. J. Opp'n* at 28-29. As explained above, reduction in property value is a cognizable injury and Plaintiffs have standing to bring their claim. It would be redundant to address the standing issue again here.

Citing *Cebollero-Bertrán v. Puerto Rico Aqueduct & Sewer Authority*, 4 F.4th 63 (1st Cir. 2021), PRASA argues the First Circuit held the 2015 Consent Decree "need not single out the specific locations the Plaintiffs allege as sources of unlawful discharge, and that the EPA suit is sufficiently analogous if the alleged unlawful discharges fall within the scope of its claims." *Id.* at 12 (citing *Cebollero-Bertrán*, 4 F.4th at 74). PRASA adds that Ms. Guerrero informed Mr. Reyes via email that Cidra Lake was, and will continue to be, included in the 2015 Consent Decree. *Id.* (citing DSMF ¶¶ 7, 8). PRASA asserts the 2015 Consent Decree includes the goals of implementing an operation and maintenance plan at all PRASA facilities and remedial measures to address discharges, and that Ms. Guerrero informed Mr. Reyes of EPA's intention to work directly with PRASA to minimize overflows affecting Lake Cidra through infrastructure projects until a final solution is achieved. *Id.* (citing DSMF ¶ 11). Therefore, PRASA suggests, the only remaining question is "if PRASA has demonstrated corrective actions which prove that there is diligent prosecution despite the 'ongoing violations.'" *Id.* at 13 (citing *Cebollero-Bertrán*, 4 F.4th at 75).

PRASA argues the diligent prosecution requires, as its name suggests, "only diligence," but "does not require government prosecution to be far reaching or zealous." *Id.* (quoting *Karr v. Hefner*, 475 F.3d 1192, 1197 (10th Cir. 2007)). Returning to the First Circuit's decision in *Cebollero-Bertrán*, PRASA contends ongoing violations alone are not dispositive evidence of non-diligent prosecution, nor is EPA required to take specific actions at a particular pace.[39] *Id.* (citing *Cebollero-*

---

[39]     PRASA offers the quotation: "violations alone do not necessarily demonstrate a lack of diligent prosecution by the EPA. The EPA is not required to take specific actions preferred by the Plaintiffs or

*Bertrán*, 4 F.4th at 75 (in turn citing *N. & S. Rivers Watershed Ass'n v. Scituate*, 949 F.2d 552, 558 (1st Cir. 1991)).  Here, PRASA says, it has corrected and minimized the impact of the alleged discharges pursuant to the SRCP protocol created in compliance with PRASA's obligations under the 2015 Consent Decree.  *Id.*  PRASA adds that additional corrective measures, such as CIPs to improve PRASA's infrastructure, have been undertaken by PRASA and points out such improvements are affected by PRASA's financial situation and competing priorities.  *Id.* at 14 (citing DSMF ¶ 8).  PRASA avers it developed a prioritization system for implementation of infrastructure projects, *id.* (citing DSMF ¶¶ 20, 21), and that the 2015 Consent Decree is being modified to include new CIPs needed due to the impacts of Hurricanes Irma and María.  *Id.*

Specifically addressing the discharges into Lake Cidra, PRASA insists it has taken significant steps to address this specific problem and prevent recurrences.  *Id.* at 15.  PRASA directs the Court to its completed replacement of a sixteen-inch pipeline and upgrade of the Treasure Valley Pump Station generator, after which overflow reports declined, as well as its planned improvement to the SSPS in Ciudad Jardín.  *Id.* (citing DSMF ¶¶ 22, 23, 25).  PRASA argues these projects demonstrate the efficacy of its actions and commitment to solving the Lake Cidra discharge issue

---

proceed at a pace they desire."  *PRASA's Summ. J. Mot.* at 13.  PRASA attributes this quotation to *Cebollero-Bertrán*, 4 F.4th 63, purportedly citing *Scituate*, 949 F.2d at 558, but this quotation does not appear in either case.  As the legal principle is correct, as stated by the First Circuit in its citation to *Scituate*, 949 F.2d at 558, the Court has paraphrased the argument.

and the Court should thus dismiss Plaintiffs' citizen suit as diligently prosecuted under the 2015 Consent Decree. *Id.* at 15-16.

PRASA also asks the Court to dismiss Plaintiffs' damages claim, positing that the CWA only permits a citizen suit for injunctive relief and civil penalties, not personal damages. *Id.* at 16-19 (citing 33 U.S.C. §§ 1319, 1365 and collecting cases).

### 2.    Plaintiffs' Opposition

Plaintiffs reject PRASA's claim that their citizen suit is barred by EPA's alleged diligent prosecution of the 2015 Consent Decree, emphasizing that the First Circuit required evidence of corrective actions prior to the filing of the complaint for the diligent prosecution bar to apply. *Pls.' Summ. J. Opp'n* at 29-30 (quoting *Cebollero-Bertrán*, 4 F.4th at 76 n.8) (to be barred by diligent prosecution, "the EPA must be diligently prosecuting at the time of the filing of the citizen suit"). Plaintiffs add that the defendant-polluter must prove that corrective actions taken in response to the government action comply with the enforcement action; "compliance 'means an end to violations, not merely a reduction in the number or size of them. That is why courts have considered whether the alleged diligent prosecution achieves a permanent solution or whether violations will continue notwithstanding the polluter's settlement with the government.'" *Id.* at 31 (quoting *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 763-64 (7th Cir. 2004)).

Turning to the present case, Plaintiffs argue PRASA's statements of fact demonstrate "(1) that it was not in compliance with the [2015 Consent Decree] by the time this Complaint was filed, and (2) none of the alleged corrective actions supposedly taken afterwards are ending the unauthorized SSOs near the Plaintiffs'

property." *Id.* Plaintiffs submit that their complaint implicates unauthorized SSOs in 2019, over a year and half after the hurricanes prompting PRASA's invocation of the 2015 Consent Decree's force majeure provisions, and further that PRASA was aware of Plaintiffs' complaints beginning in 2015. *Id.* Plaintiffs argue that PRASA relies on undefined "projects," which fail to effectively address the problem with sewer lines and the Treasure Valley Pump Station, and that PRASA has failed to perform its duties to attend an unauthorized SSO under the SRCP as mandated by the 2015 Consent Decree. *Id.* at 31-32. The evidence, Plaintiffs maintain, demonstrates PRASA's lack of compliance with the SRCP. *Id.* at 32.

Responding to PRASA's factual allegations, Plaintiffs contend that PRASA presents "no statistical evidence as of the reduction of the unauthorized SSOs near the Plaintiffs' property," nor did it produce evidence of "[t]he supposed 'water analysis' that 'indicates no contamination.'" *Id.* at 33. They compare this to the test results of the sampling done by Ms. Siberón identifying coliforms and fecal matter and thus contradicting the purported "effectiveness" of PRASA's alleged actions, which Plaintiffs posit were "never demonstrated for the record." *Id.*

Plaintiffs also respond to PRASA's argument that their request for damages should be dismissed, insisting that their damages claims "are not based upon 33 U.S.C. §1365(a), but upon the Commonwealth of Puerto Rico's relevant statutes on nuisance and riparian rights." *Id.* at 34 (citing *Compl.* at 6). They point out that the section titled "Other causes of action" in their complaint expressly brings claims under "the Nuisance Abatement law (Ley sobre Estorbo Público) P.R. LEYES AN. TIT.

32 §2761 (2023) and Puerto Rico's riparian rights (Act No. 180 of October 29, 2014 P.R. LEYES AN. TIT. 12 §§421 et seq.; and Rule No. 1300.4 of EQB's Regulation No. 8732, Water Quality Standards Regulation (2016)." *Id.*

After submitting that this Court has supplemental jurisdiction over these state law claims as "part of the same case or controversy as [the] federal claims," *id.* at 34-36, Plaintiffs direct the Court to the so-called CWA saving clause, 33 U.S.C. §1365(e), to argue that federal statute and caselaw make clear that state statutory and common law claims are not preempted by the CWA citizen suit provision. *See id.* at 35-37 (citing 33 U.S.C. §1365(e) ("Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)"); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497-98 (1987); *Save Our Sound Fisheries Ass'n v. Callaway*, 429 F. Supp. 1136, 1148 (D.R.I. 1977)). Plaintiffs thus ask the Court to reject PRASA's motion for the Court to dismiss their claim for damages. *Id.* at 38.

### 3.    PRASA's Reply

PRASA contends that two demonstrations are required for the diligent prosecution bar on a CWA citizen suit to apply: "(1) [w]hether EPA's suit is sufficiently analogous if the alleged unlawful discharges fall within the scope of its claims. . .. [and] (2) [t]hat EPA is diligently pursuing PRASA's compliance with 2015 [Consent Decree]." *PRASA's Summ. J. Reply* at 17. On the first factor, PRASA submits all concerned parties—PRASA, EPA, and the Plaintiffs—agree that the discharges alleged in the complaint fall within the scope of the 2015 Consent Decree

"as well as its 2024 recent modification." *Id.*   Regarding the second factor, PRASA insists it has "implemented different controls and taken different measures to minimize the situation," and that that a final solution has been delayed due to force majeure events.  *Id.*  Based on these uncontrollable occurrences, "PRASA entered into a renegotiation process with the EPA," during which "Plaintiffs had the opportunity to be heard and commented on the proposed changes to the [Consent Decree]." *Id.* PRASA points out Plaintiffs' comment was considered, and EPA's response is part of the official record of the 2024 modification case.  *Id.*

PRASA reiterates that the diligent prosecution bar does not require EPA to take specific actions or a particular pace, *id.* (citing *Cebollero-Bertrán*, 4 F.4th at 75 (in turn citing *Scituate*, 949 F.2d at 558)), and reminds the Court that Plaintiffs admit that "PRASA has a pending project to handle the SSOs affecting the area in which their property is located." *Id.* at 17-18.  While PRASA concedes a budget shortfall is causing a delay, it avers it "is working hard to obtain the necessary funding to implement the project." *Id.* at 18.   PRASA adds that the 2015 Consent Decree includes a prioritization system for PRASA to apply its limited resources to the most critical projects first, and states it "has applied several control measures that have reduced the frequency and duration of the SSO[]s and will continue to work to put an end to the situation." *Id.*  PRASA concludes by again asking the Court to grant its motion for summary judgment.  *Id.*

### 4.    Plaintiffs' Sur-reply

Plaintiffs direct the Court to its own order denying PRASA's previous motion to dismiss, in which it wrote:

> The *Cebollero-Bertrán* court clarified that while a consent decree represents a step in the right direction, it is not a "cure-all," for further action-in addition to the entry of the consent decree-is required such that said document comes to life and serves its purpose, in this case: to implement corrective actions to right PRASA's failure to abide by the CWA.

*Pls.' Summ. J. Sur-reply* at 19 (quoting *Omnibus Op. and Order* at 16 (in turn citing *Cebollero-Bertrán*, 4 F.4th at 74-75)).   Thus, Plaintiffs say, PRASA must "provide evidence of comparable corrective actions being taken or that the EPA must be diligently prosecuting at the time of the filing of the citizen suit in order to trigger the diligent prosecution bar." *Id.* (citing *Cebollero-Bertrán*, 4 F.4th at 76 n.8).

In the case at bar, Plaintiffs say, the evidence shows "that by the time that the overflows were happening, and by the time the Complaint was filed, PRASA was not in compliance with the provisions of the [2015] Consent Decree, in particular, with the provisions contained in the [SRCP]." *Id.* at 20.   Plaintiffs contend that the evidence provided by PRASA shows only corrective actions taken after the complaint was filed or lacking sufficient information to determine compliance with the 2015 Consent Decree and SRCP, and therefore reiterate their request for the Court to deny PRASA's motion for summary judgment. *Id.*

## B.   Discussion

### 1.   Diligent Prosecution Bar[40]

PRASA contends the 2015 Consent Decree and subsequently undertaken infrastructure projects demonstrate EPA's diligent prosecution of any alleged

---

[40]     Following oral argument, PRASA submitted that "[i]n light of *Loper* [*Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)], this Honorable Court has the authority to independently assess whether PRASA's compliance efforts, along with the actions of federal and state agencies, satisfy the Diligent Prosecution bar," without deference to an agency's statutory interpretation. *Mot. in*

violations, such that the Court should deem Plaintiffs' CWA citizen suit barred pursuant to 33 U.S.C. § 1365(b)(1).  *PRASA's Summ. J. Mot.* at 11-15.  Plaintiffs disagree, positing that the evidence shows longstanding and ongoing noncompliance with the terms of the 2015 Consent Decree at the time their complaint was filed, such that the diligent prosecution bar does not apply.  *Pls.' Summ. J. Opp'n* at 30-33.

Both parties agree the First Circuit's analysis of the diligent prosecution bar in *Cebollero-Bertrán*, 4 F.4th 63, governs this case.  In that decision, the First Circuit framed the inquiry by explaining that courts "grant considerable, although not unlimited, 'deference to the agency's plan of attack.'" *Cebollero-Bertrán*, 4 F.4th at 74 (quoting *Scituate*, 949 F.2d at 557).  Continuing, the First Circuit noted that "the alleged polluter cannot immunize itself from CWA citizen suits by agreeing to a government agency's 'plan of attack,' such as a consent decree, without actually taking any subsequent remedial steps."  *Id.*  Regarding consent decrees, the First Circuit explained "[w]hile the entry of the consent decree is certainly relevant, it is not conclusive evidence of diligent prosecution."  *Id.* at 75.  Thus, the First Circuit wrote, "[i]t is the Court's duty to probe the government's prosecutorial vigor and

---

*Compliance* at 13.  Plaintiffs agree.  *See Pls.' Mot. In Resp. to PRASA's Mot. for Leave to Supp. or Resubmit Mot. for Summ. J. in Light of Recent Changes in Legal Framework* (ECF No. 189) ("In sum, the central holding of *Loper Bright* is that courts must exercise independent judgment when interpreting statutes and may not defer to agency interpretations simply because a statute is ambiguous").  While true, the Court concludes *Loper Bright* is inapposite to the diligent prosecution defense, which does not present a question of statutory interpretation, but rather is more akin to the doctrines of preemption or primary jurisdiction based on the primary enforcement responsibilities of EPA and state agencies.  *See Gwaltney*, 484 U.S. at 60 ("the citizen suit is meant to supplement rather than to supplant governmental action").  No ambiguous statute, or an interpretation thereof, is at issue in this case.  As such, *Loper Bright*'s directive regarding statutory interpretation is inapplicable and the Court thus conducts an independent review of the record presented to determine if PRASA has demonstrated Plaintiffs' CWA citizen suit should be barred by EPA's diligent prosecution.

events transpiring post-entry of the Consent Decree." *Id.* at 74-75 (quoting *S. River Watershed All., Inc. v. DeKalb Cnty.*, 484 F. Supp. 3d 1353, 1368 (N.D. Ga. 2020)). "The 'events transpiring post-entry of the Consent Decree' include whether the alleged polluter has continued to violate the CWA." *Id.* at 75. While "an ongoing violation cannot, by itself, prove a lack of diligent prosecution sufficient to overcome the § 1365(b)(1)(B) bar on citizen suits," "ongoing violations are not irrelevant to the question of diligent prosecution." *Id.* (internal citations omitted).

The *Cebollero-Bertrán* Court also referred at length to its prior decision in *North & South Rivers Watershed Association v. Scituate*, 949 F.2d 552, which affirmed a district court's summary judgment order concluding the enforcement action of the Massachusetts Department of Environmental Protection[41] barred a citizen suit based on "detailed evidence of its efforts to comply with a state enforcement order to correct its violations." *Id.* at 75-76 (citing *Scituate*, 949 F.2d at 557). In *Cebollero-Bertrán*, the First Circuit noted that "[i]f PRASA has comparable evidence of subsequent corrective actions in this case, which will prove diligent prosecution despite the ongoing violations, it can provide that evidence during properly conducted summary judgment proceedings." *Id.* at 76. However, it noted the critical timing for such evidence: "EPA must be diligently prosecuting at *the time*

---

[41]    The CWA diligent prosecution bar takes effect not only as a result of actions brought by EPA, but also based on actions brought by a state government agency under a state law comparable to the CWA. *See SURCCO v. PRASA*, 157 F.Supp.2d 160 (2001) ("Logically, as [*Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 60-61 (1987)] stated, and *Scituate*, 949 F.2d at 555 reiterated, '. . .when it appears that governmental action under either the Federal or comparable State [Clean Water Act] begins and is diligently prosecuted, the need for citizen's suits vanishes'"). In *Scituate*, the action predicating an application of the diligent prosecution bar was an action taken pursuant to Massachusetts state law by the Massachusetts Department of Environmental Protection.

*of the filing of the citizen suit* in order to trigger the diligent prosecution bar." *Id.* at 76 n.8 (emphasis supplied).

Given the relevance of the First Circuit's analysis in *Scituate*, 949 F.2d 552, this Court reviews that decision in closer detail. After emphasizing that "[w]here an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the agency's plan of attack should be particularly favored," the *Scituate* Court noted that "[t]he record shows the town has complied with a variety of mandatory and ongoing tasks since the Order was issued in 1987." *Scituate*, 949 F.2d at 557. The *Scituate* Court further explained:

> these tasks include: (1) the submission of monthly, weekly and daily test results from groundwater monitoring wells, effluent tanks and discharges to the tidal ditch; (2) the expenditure of close to one million dollars to plan the new treatment facility; and (3) enforcement of a sewer hookup moratorium. Further, the Order specifically leaves open the possibility of imposing penalties upon the town. Scituate is well into the process of diligently complying with Administrative Order Number 698.

*Id.* Continuing, the *Scituate* Court explained that the Government "is already acting with diligence to remedy the violations Appellants seek to enjoin." *Id.* at 558. In that case, "Appellants argue[d] their claim for injunctive relief should stand because the violations have been ongoing since the Order issued." *Id.* "Yet," the *Scituate* Court noted, "violations may continue despite everything reasonably possible being done by the State and Appellee to correct them." *Id.* The *Scituate* Court emphasized that "[a]t oral arguments, Appellants conceded their suit was brought primarily to 'spur action' on the part of the [Government] and Appellee." *Id.* The *Scituate* Court concluded "action is already being taken by those parties. Merely because the State

may not be taking the precise action Appellant wants it to or moving with the alacrity Appellant desires does not entitle Appellant to injunctive relief." *Id.*

In the present case, Plaintiffs do not dispute that the 2015 Consent Decree includes "the evaluation of the sanitary sewer system to define the I/I problems followed by the identification of necessary corrective measures and their implementation," including "the sanitary sewer system that affects Cidra Lake." DSMF ¶¶ 7, 8; PRDSMF ¶¶ 7, 8. Thus, the relevant inquiry at the summary judgment stage becomes whether PRASA has presented evidence that it has "actually tak[en] any subsequent remedial steps" pursuant to the terms of that agreement by the time Plaintiffs filed their complaint on December 13, 2019, such that "there [is] no material dispute as to diligent prosecution based on both the state order and the alleged polluter's 'subsequent action.'" *See Cebollero-Bertrán*, 4 F.4th at 74, 76 & n.8; *see also Compl.* As instructed by the First Circuit, this Court reviews the record for "comparable evidence of subsequent corrective actions," *Cebollero-Bertrán*, 4 F.4th at 74, that "specifically address[] the concerns of [the] analogous citizen's suit," as presented in *Scituate*. 949 F.2d at 557.

On this issue, PRASA presents evidence that it completed project CIP 3-21-5020, on August 10, 2022, which included the replacement of a sixteen-inch diameter pipeline at the bridge in state road 172. DSMF ¶ 22. The interrogatory response cited in support of this statement does not provide further information on when CIP 3-21-5020 began. *PRASA's Interrogs. Answer.* PRASA additionally submits evidence of two other projects, CIP 3-21-5021, to improve the Ciudad Jardín SSPS, and CIP 0-

80-0074E, to replace the Treasure Valley Pump Station power generator. DSMF ¶ 23. The planning stage of CIP 3-21-5021 began in August 2023, while CIP 0-80-0074E began in May 2022. *Id.*

PRASA presents further evidence, via a letter from EPA to Mr. Reyes on May 8, 2019, that the 2015 Consent Decree was being modified to account for the damage caused by Hurricanes Irma and María, and that EPA will continue to work with PRASA to address sewage overflows until a final solution is achieved. DSMF ¶ 11. EPA sent this letter on May 8, 2019. *EPA's E-mail to Pls.* at 1.

PRASA also submits that it "requested Force Majeure protection for ongoing and upcoming work and deadlines and stipulated penalties under the 2015 [] Consent Decree." DRPSAMF ¶ 6 (quoting *2018 CER Excerpts*). The 2018 CER does not indicate the scope of the force majeure invocation on the Lake Cidra area and PRASA agrees neither the 2019 CER nor 2020 CER specifically mention any SSOs affecting the Lake Cidra area, nor any capital improvement proposals to correct the problem. PSAMF ¶ 12; DRPSAMF at 11. Further, the 2018 CER, published in August 2018, notes "[m]ost of the facilities have since been brought to operational status and are expected to continue to serve their intended operational purpose." DRPSAMF ¶ 5. It is thus unclear whether the violations alleged in the complaint, which span from February to August of 2019, can be fairly attributed to the effects of the 2017 hurricanes or are protected from enforcement of the 2015 Consent Decree under the Force Majeure provision.

Comparatively, viewed in a light most favorable to Plaintiffs, the record contains evidence of repeated violations of the 2015 Consent Decree, both substantively and procedurally.

First, for the purposes of the present summary judgment motion, the record reflects PRASA reported only one SSO, which occurred on April 1, 2016, to EPA, despite nine documented SSOs occurring in the Treasure Valley Pump Station from 2015 to 2016.  PSAMF ¶¶ 21, 23; DRPSAMF at 11.  Under the terms of the SRCP, the mandatory plan submitted to EPA pursuant to Section XVIII of the 2015 Consent Decree and attached as an exhibit to the summary judgment motion by PRASA itself, PRASA "is required to notify regulatory agencies within 24 hours of identifying an overflow event."  *PRASA's Summ. J. Mot.*, Attach. 9, *Spill Response and Cleanup Plan (SRCP) Submission* at 1, 18 (*SRCP*); *see also PRASA's Summ. J. Mot.*, Attach. 8, *2015 Consent Decree Excerpt: Section XVIII Spill Resp. and Cleanup Plan* at 8-9 (*2015 Consent Decree Excerpt*) ("PRASA has implemented and shall continue to implement a Spill Response and Cleanup Plan ('SRCP') that specifies actions to be taken by PRASA to address SSOs, Unauthorized Releases, and CSOs from all Facilities" and "Under the SRCP, PRASA shall utilize the form attached . . . to report every Unauthorized Release and SSO that occurs from a point not authorized by a NPDES permit.  Reporting . . . shall begin no later than October 31, 2015"); PSAMF ¶ 19.  Thus, PRASA's failure to report the other eight instances of documented SSOs within twenty-four hours would constitute violations of the 2015 Consent Decree and corresponding provisions of the SRCP.

67

Second, the summary judgment record reflects PRASA's engineer "did not see any post-remedial investigations of any SSOs in the Cidra area as required by the SRCP and did not include them in his report to EPA." PSAMF ¶ 20; DRPSAMF ¶ 20. Section 4.2.2 of the SRCP, Performing Post-Remediation Investigations, states "[a]s necessary, an investigation is performed by Operations personnel after the sewer overflow has been stopped and/or contained." *SRCP* at 21; PSAMF ¶ 19. Here, viewing the facts and drawing all reasonable inferences in favor of the nonmoving party, *Ophthalmic Surgeons, Ltd.*, 632 F.3d at 35, the Court concludes that a post-remedial investigation of the SSOs in the Cidra area was necessary based on the documented overflows, such that the alleged failure to do so constituted a separate violation of the procedural commitment of the SRCP.

Third, the record reflects PRASA did not conduct root-cause analysis of the alleged SSOs because, in the words of its interrogatory response, "they are not required by law." PSAMF ¶ 22 (quoting *Siberón Dep. Tr. and Exs.* at 43); DRPSAMF at 11. This apparently intentional inaction is not supported by the facial terms of the SRCP, which states "[a]fter the cause of the sewer overflow is corrected, a post-event investigation will determine the root cause of the overflow as well as measures that could be implemented to prevent it from occurring in the future" and specifically lists, by subsection, "[p]otential preventative measures based on the root cause identified," which include "debris/sediment introduced by external source," "roots", "fats, oils, and grease," and "collapsed pipe (includes sag and offset failures)." *SRCP* at 21-22 (capitalization altered); PSAMF ¶ 19.

PRASA does not respond to these procedural violations, nor, indeed, to the 2019 overflows underlying the Plaintiffs' complaint, by offering evidence of actions taken in response to these issues, as would support diligent prosecution.   The infrastructural projects it presents as dispositive evidence, including CIP 3-21-5020, CIP 3-21-5021, and CIP 0-80-0074E, all post-date the filing of the complaint on December 13, 2019. *See Compl.*   Further, while it relies heavily on the purported invocation of the force majeure provision of the 2015 Consent Decree, PRASA has not presented sufficient evidence for the Court to understand if and when EPA agreed to its invocation, the grace period allowed by EPA in response, or the scope of its effects on PRASA's obligations pursuant to the 2015 Consent Decree and SRCP.   PRASA's only explanation of the force majeure provision is citing secondhand accounts from the 2018 CER and EPA's reference to the 2015 Consent Decree "currently being modified to include new capital improvements projects needed due to the impacts to water and wastewater infrastructure caused by Hurricanes Irma and María."  *See* DRPSAMF ¶ 9 (quoting *2018 CER Excerpts* at 6-15 – 6-22); DSMF ¶ 7.

Based on an excerpt of the 2015 Consent Decree provided by PRASA that includes the Table of Contents, the Court understands Section XXVII of the Consent Decree sets forth the force majeure provision, *2015 Consent Decree Excerpt* at 4; however, PRASA did not provide this provision to the Court on the summary judgment record.  Further, while PRASA attaches to its reply a declaration by EPA official Mr. Géliga in support of the modification to the 2015 Consent Decree, the declaration was made on January 23, 2024, over four years after Plaintiffs filed their

complaint.  *Compare Compl.* (filed December 14, 2019) *with Decl. of Jaime A. Géliga* at 12 (dated January 23, 2024).

The First Circuit in *Cebollero-Bertrán* wrote that PRASA could prove diligent prosecution, despite ongoing violations, if it presented "comparable evidence of subsequent corrective actions" to the evidence presented in *Scituate*, 949 F.2d 552. In *Scituate*, "[t]he record  shows the town has complied with a variety of mandatory and ongoing tasks since the [Administrative] Order was issued in 1987," which included "(1) the submission of monthly, weekly and daily test results from groundwater monitoring wells, effluent tanks and discharges to the tidal ditch; (2) the expenditure of close to one million dollars to plan the new treatment facility; and (3) enforcement of a sewer hookup moratorium." *Scituate*, 949 F.2d at 557.  Based on these efforts, which the *Scituate* Court described as "everything reasonably possible being done," the *Scituate* Court found diligent prosecution despite ongoing violations. *Id.* at 558.  In the present case, however, PRASA has failed to present comparable evidence of taking all "reasonably possible" corrective actions since entering into the 2015 Consent Decree and prior to the filing of the complaint.  PRASA's protestations regarding budgetary constraints and the effect of hurricanes further fail to convince the Court, as there remains a genuine factual dispute as to whether such obstacles obviate PRASA's obligation to, inter alia, report unauthorized SSOs to EPA and to undergo root cause analysis of the same.

The *Scituate* Court also emphasized that the Administrative Order "specifically leaves open the possibility of imposing penalties upon the town." *Id.*

Here, the Table of Contents of the 2015 Consent Decree appears to indicate the same possibility of penalties by listing section "XXII. Penalties." *2015 Consent Decree Excerpt* at 2. Again, however, PRASA did not submit this section of the 2015 Consent Decree for review as part of the summary judgment record and, further, Plaintiffs have presented evidence of PRASA's noncompliance with their agreed-to investigative and reporting obligations, as discussed above, without PRASA presenting any evidence of penalties imposed by EPA for these alleged violations.

Finally, in the Court's view, important legal questions remain unaddressed by the parties and unresolved by the present motion. Specifically, the parties have not presented argument as to the geographic scope of the diligent prosecution bar, which is critical in this case where PRASA's systems cover the entire island of Puerto Rico. The parties agree that the 2015 Consent Decree provides for a prioritization system for remedial projects, DSMF ¶ 20; PRDSMF ¶ 20, but it is not at all clear from the record that PRASA's expenditures on infrastructure projects in, for example, Cabo Rojo on the other side of the island, would be sufficient to bar Plaintiffs' citizen suit for alleged violations in Cidra. The *Scituate* Court wrote that the diligent prosecution bar applies "[w]here an agency has specifically addressed the concerns of an analogous citizen's suit." *Scituate*, 949 F.2d at 557. Here, the only infrastructure projects in the Cidra area specified by PRASA were taken after Plaintiffs' complaint was filed. DSMF ¶¶ 17, 22-23, 25; PRDSMF ¶¶ 17, 22-23, 25. Further, while the prioritization system governs infrastructure projects, the Court has received no evidence to suggest the prioritization system justifies PRASA's noncompliance with

71

the remedial measures required in response to an unauthorized release, nor EPA's apparent failure to impose stipulated penalties also contemplated by the 2015 Consent Decree and SRCP.  PSAMF ¶ 19; DRPSAMF at 11.

As previously described, the First Circuit clearly held that "EPA must be diligently prosecuting at the time of the filing of the citizen suit in order to trigger the diligent prosecution bar." *Cebollero-Bertrán*, 4 F.4th at 76 n.8.  It may well be that PRASA has undertaken timely expenditures and infrastructural improvement projects addressing the violations alleged by Plaintiffs, as would be sufficient to justify an application of the diligent prosecution bar.  However, to be granted summary judgment, it is the movant's burden to show "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Based on the record currently before the Court of unauthorized discharges and procedural reporting violations, and a lack of evidence indicating PRASA or EPA "specifically addressed the concerns of an analogous citizen's suit," *Scituate*, 949 F.2d at 557, prior to the filing of the complaint, PRASA has failed to convince the Court that it took all "reasonably possible" compliance actions, *id.* at 558, as would bar Plaintiffs' citizen suit by diligent prosecution.  As such, the Court declines to grant PRASA's motion for summary judgment.

### 2. Damages Claims

PRASA argues Plaintiffs' damages claim should be dismissed, characterizing this claim as brought pursuant to the CWA and asserting that statute does not provide for such relief. *PRASA's Summ. J. Reply* at 16-17.  Plaintiffs dispute this

characterization, explaining that their request for damages arises from their state law claims, which are not preempted by the CWA. *Pls.' Summ. J. Opp'n* at 36-37.

PRASA is correct that the CWA citizen suit provision does not provide for personal damages claims. *See, e.g., Nat'l Sea Clammers Ass'n*, 453 U.S. at 18 n.27 (noting the CWA "expressly excludes damages actions" (quoting 116 Cong. Rec. 33102 (1970) (statement of Sen. Muskie)).  However, the CWA saving clause, 33 U.S.C. § 1365(e), expresses Congress's intent that the statute not preempt other forms of relief pursuant to separate causes of action, providing in no unclear terms: "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief."  In the landmark case *International Paper Company v. Ouellette*, the Supreme Court held the CWA nonetheless preempts federal common law claims; however, in the same decision, the Supreme Court wrote that "[t]he saving clause specifically preserves other state actions, and therefore nothing in the [CWA] bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the source State" and that "this authority may include the right to impose higher common-law as well as higher statutory restrictions."  *Int'l Paper Co.*, 479 U.S. at 497.

In this action, Plaintiffs bring claims for nuisance and violations of their riparian rights under the state laws of Puerto Rico. *See Compl.* ¶¶ 37-41; *Pls.' Summ. J. Opp'n* at 34.  PRASA makes no argument that the diligent prosecution bar should apply to state claims, nor does it challenge the supplemental jurisdiction of this Court

73

over these state law claims as Plaintiffs preemptively address in their opposition.  *See id.* at 34-36.

The Court briefly addresses *SURCCO v. PRASA*, 157 F. Supp. 2d 160 (2001), as raised and discussed by the parties.  Plaintiffs incorrectly assert that "in *SURCCO*, there were no other allegations besides the Section 505 of the CWA, nor claims under the applicable Commonwealth environmental or nuisance statutes."  *Id.* at 38.  This is contradicted by the plain terms of that opinion, which notes SURCCO brought claims "under the provisions of the Water Pollution Prevention Act (also known as the [CWA]), 33 U.S.C. §[ ]1251 et seq., the provisions of the Puerto Rico Nuisance Law, 32 P.R. LAWS ANN. §[ ]2761 et seq., and §[ ]1802 of the Civil Code of Puerto Rico, 31 P.R. LAWS ANN. §[ ]5141."  *SURCCO*, 157 F. Supp 2d at 162.

Nonetheless, the *SURCCO* Court did not address damages for the state law claims; ruling on PRASA's motion to dismiss, the *SURCCO* Court first dismissed the CWA claims pursuant to the diligent prosecution bar.  *Id.* at 170.  It then noted "[the] dismissal of Plaintiffs' federal claim leaves only Plaintiffs' claim under Puerto Rico law" and "decline[d] to exercise supplemental jurisdiction over Plaintiffs' Commonwealth claims against Defendant," dismissing the state law claims without prejudice based on the early stage of the suit at the time of dismissal of the federal claim.  *Id.*

The holding of the *SURCCO* Court is inapposite to the present case because, as previously explained, the Court declines to dismiss Plaintiffs' federal claim under the CWA.  Further, the *SURCCO* Court offered no opinion on the propriety of

damages claims under related state law claims, which is the vehicle for requested damages in the present case. PRASA has not explained why the related state claims should be dismissed, nor why the Court lacks supplemental jurisdiction over the same in light of the federal CWA claim. Therefore, the Court declines to dismiss the personal damages claims brought pursuant to Puerto Rico nuisance and riparian rights law.

## VI.    CONCLUSION

The Court DISMISSES Puerto Rico Aqueduct & Sewer Authority Motion in Limine (ECF No. 185) in *Reyes-Muñoz v. Puerto Rico Aqueduct & Sewer Authority*, No. 3:19-cv-02131-JAW.

The Court further DENIES Puerto Rico Aqueduct & Sewer Authority Motion for Summary Judgment (ECF No. 151) in *Reyes-Muñoz v. Puerto Rico Aqueduct & Sewer Authority*, No. 3:19-cv-02131-JAW.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of July, 2025